SUSAN BYSIEWICZ *v.* NANCY DINARDO ET AL.
(SC 18612)

Norcott, Katz, Palmer, Vertefeuille, Zarella, McLachlan and Bishop, Js.*

* The listing of the justices reflects their seniority status on this court as of the date of oral argument.

Argued May 18—officially released May 18, 2010[**]

*Eliot B. Gersten,* with whom were *John H. Van Lenten* and, on the brief, *John R. Robacynski,* for the appellant (intervening defendant).

*Daniel J. Krisch* and *Wesley W. Horton,* for the appellee (plaintiff).

*Gregory T. D'Auria,* senior appellate counsel, with whom were *Robert W. Clark,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, and *Perry Zinn-Rowthorn,* associate attorney general, for the appellee (state).

---

[**] May 18, 2010, the date that the order reversing the judgment of the trial court was released, is the operative date for all substantive and procedural purposes.

*Opinion*

NORCOTT, J. The plaintiff, Susan Bysiewicz, brought this action against the defendants, Nancy DiNardo, the chair of the Connecticut Democratic Party, the Connecticut Democratic Party and the office of the secretary of the state of Connecticut seeking a declaratory judgment that, in carrying out her responsibilities as the secretary of the state, she has engaged in the active practice of law within the meaning of General Statutes § 3-124[1] or, in the alternative, that the statutory requirement that the attorney general be "an attorney at law of at least ten years' active practice at the bar of this state" violates article sixth, § 10, of the Connecticut constitution, as amended by articles two and fifteen of the amendments.[2] Thereafter, the Connecticut Republican Party (intervening defendant) filed a motion to intervene as a defendant, which the trial court granted.[3] After a trial to the court, the trial court concluded that the plaintiff's performance of her responsibilities as the secretary of the state constituted the active practice of law under § 3-124 and, accordingly, rendered judgment for the plaintiff. The intervening defendant then filed this appeal.[4] After an expedited hearing, this court ren-

[1] General Statutes § 3-124 provides in relevant part: "There shall be an Attorney General to be elected in the same manner as other state officers in accordance with the provisions of section 9-181. The Attorney General shall be an elector of this state and an attorney at law of at least ten years' active practice at the bar of this state. . . ."

[2] Article sixth, § 10, of the constitution of Connecticut, as amended by articles two and fifteen of the amendments, provides: "Every elector who has attained the age of eighteen years shall be eligible to any office in the state, but no person who has not attained the age of eighteen shall be eligible therefor, except in cases provided for in this constitution."

[3] The trial court also granted Hartford Courant Company's motion to intervene for the sole purpose of contesting the plaintiff's motion for a protective order barring access to the transcript and videotape of her deposition in this case.

[4] The intervening defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

dered judgment in the form of a truncated opinion reversing the judgment of the trial court and declaring that the plaintiff did not meet the requirements of § 3-124 and that the statute was constitutional. We indicated that a full opinion explaining our decision would be released at a later date. This is that opinion.

The trial court found the following facts. The plaintiff has served as the secretary of the state since 1999. She graduated from Duke University School of Law in 1986 and spent the next six years as an attorney in private practice at law firms in New York City and Hartford. She then spent two years practicing health care and pension law at Aetna Life and Casualty Insurance Company in Connecticut. From 1993 to 1999, the plaintiff represented the constituents of the 100th district in the state House of Representatives. She was elected as the secretary of the state in November, 1998.

The plaintiff's statutory responsibilities as the secretary of the state include acting as the commissioner of elections pursuant to General Statutes §§ 9-3[5] and 9-4.[6]

[5] General Statutes § 9-3 provides: "The Secretary of the State, by virtue of the office, shall be the Commissioner of Elections of the state, with such powers and duties relating to the conduct of elections as are prescribed by law and, unless otherwise provided by state statute, the secretary's regulations, declaratory rulings, instructions and opinions, if in written form, shall be presumed as correctly interpreting and effectuating the administration of elections and primaries under this title, except for chapter 155, provided nothing in this section shall be construed to alter the right of appeal provided under the provisions of chapter 54."

[6] General Statutes § 9-4 provides: "The Secretary of the State, in addition to other duties imposed by law, shall, as such commissioner, (1) advise local election officials in connection with proper methods of conducting elections and referenda as defined in subsection (n) of section 9-1, and, upon request of a municipal official, matters arising under chapter 99; (2) prepare regulations and instructions for the conduct of elections, as designated by law; (3) provide local election officials with a sufficient number of copies of election laws pamphlets and materials necessary to the conduct of elections; (4) distribute all materials concerning proposed laws or amendments required by law to be submitted to the electors; (5) recommend to local election officials the form of registration cards and blanks; (6) determine, in the manner provided by law, the forms for the preparation of voting

In that capacity, she is authorized to issue, and has issued, "[regulations], declaratory rulings, instructions and opinions" on issues of election law under title 9 of the General Statutes. In addition, the plaintiff has advised local election officials regarding the proper methods of conducting elections. The plaintiff also has worked with her staff to draft proposed legislation and regulations concerning the areas for which the secretary of the state has responsibility or oversight.

On January 13, 2010, the plaintiff declared her candidacy for the office of attorney general. Thereafter, questions arose as to whether: (1) "active practice at the bar of this state" as used in § 3-124 requires more than being a member of the Connecticut bar; (2) if so, whether the plaintiff meets the qualifications for the office of attorney general as set forth in § 3-124; and (3) if she does not meet those qualifications, whether § 3-124 is unconstitutional under the state and federal constitutions. In her capacity as commissioner of elections, the plaintiff requested an opinion from the current attorney general, Richard Blumenthal, on these questions. The attorney general issued a formal opinion in which he concluded that § 3-124 requires more than being a member of the Connecticut bar with an active status and that the statute was constitutional. The attorney general also concluded that the question of whether the plaintiff meets the requirements of the statute "must

machines, for the recording of the vote and the conduct of the election and certification of election returns; (7) prepare the ballot title or statement to be placed on the ballot for any proposed law or amendment to the Constitution to be submitted to the electors of the state; (8) certify to the several boards the form of official ballots for state and municipal offices; (9) provide the form and manner of filing notification of vacancies, nomination and subsequent appointment to fill such vacancies; (10) prescribe, provide and distribute absentee voting forms for use by the municipal clerks; (11) examine and approve nominating petitions filed under section 9-453o; and (12) distribute corrupt practices forms and provide instructions for completing and filing the same."

be left to judicial determination pursuant to established judicial procedures."

The plaintiff then filed this action seeking a declaratory judgment that she satisfied the criteria set forth in § 3-124 or, in the alternative, that the statute was unconstitutional under article sixth, § 10, of the Connecticut constitution. The intervening defendant claimed as special defenses that the trial court lacked jurisdiction and that the action was barred by the doctrines of laches, equitable estoppel and waiver. In its memorandum of support of its special defense that the trial court lacked subject matter jurisdiction, the intervening defendant argued that the plaintiff lacked standing because she had made no claim and presented no evidence that anyone had called into question her right to run for the office of attorney general.

The trial court determined that the plaintiff had standing to bring this action and that her claims were ripe. The trial court then rejected the plaintiff's claim that "merely being admitted to and maintaining one's active status as a member of the Connecticut bar for at least ten years" satisfies the requirements of § 3-124.[7] It also rejected the intervening defendant's claim that "active practice at the bar of this state" means active practice as a litigator. Instead, the trial court concluded that "the 'ten years' active practice' requirement . . . must be understood to mean that the attorney general had ten years experience actually engaging in some form of legal practice as a member of the bar of this state, although not necessarily doing so in a courtroom, or on a continuing basis, or with any particular degree of frequency or intensity." The court also concluded that, when a person "us[es] legal judgment and skill to apply the law to specific facts and circumstances, [he or] she is practicing law." Finally, the court found that the

---

[7] The plaintiff does not challenge this conclusion on appeal to this court.

plaintiff's performance of some of her duties as the secretary of the state constituted the active practice of law under § 3-124. Accordingly, it rendered judgment for the plaintiff.

The intervening defendant then brought this appeal claiming that the trial court improperly rejected its claim that § 3-124 requires that, to be eligible to serve as the attorney general, a person have ten years active practice before the courts of this state as a litigator. After the intervening defendant filed the appeal, this court sua sponte ordered the parties to submit supplemental briefs on the question of whether the trial court properly determined that the plaintiff had standing to bring this action and that her claims were ripe. In its supplemental brief, the intervening defendant contended that the trial court improperly concluded that it had subject matter jurisdiction. The plaintiff disputes both the intervening defendant's jurisdictional claims and its claim on the merits. She also claims as an alternate ground for affirmance that, if this court agrees with the intervening defendant's interpretation of § 3-124, the statute is unconstitutional under article sixth, § 10, of the Connecticut constitution.[8] We conclude that the trial court properly concluded that the plaintiff had standing and that her claims were ripe. We further conclude that the plaintiff's performance of her responsibilities as the secretary of the state does not constitute the "practice of law" under § 3-124. Finally, we conclude that § 3-124 is constitutional.

I

We first address the intervening defendant's claim that the trial court improperly determined that the plaintiff had standing to seek declaratory relief and that her claims were ripe. Specifically, the intervening defendant claims that there is no question or uncertainty about

[8] The plaintiff has abandoned any claims under the federal constitution.

whether the plaintiff is entitled to *run* for the office of attorney general and any question about her qualifications to *serve* in that office are not ripe. We disagree.

"The purpose of a declaratory judgment action, as authorized by General Statutes § 52-29[9] and Practice Book § [17-55],[10] is to secure an adjudication of rights where there is a substantial question in dispute or a substantial uncertainty of legal relations between the parties." (Internal quotation marks omitted.) *Wilson* v. *Kelley*, 224 Conn. 110, 115, 617 A.2d 433 (1992). Practice Book § 17-55 requires that the plaintiff be in danger of a "loss or of uncertainty as to [his] rights or other jural relations" and that there be a "bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations . . . ." Thus, "[d]eclaratory relief is a mere procedural device by which various types of substantive claims may be vindicated." (Internal quotation marks omitted.) *Wilson* v. *Kelley*, supra, 115–16.

"Implicit in these principles is the notion that a declaratory judgment action must rest on some cause of action that would be cognizable in a nondeclaratory suit. . . . To hold otherwise would convert our declaratory judgment statute and rules into a convenient route for pro-

[9] General Statutes § 52-29 (a) provides: "The Superior Court in any action or proceeding may declare rights and other legal relations on request for such a declaration, whether or not further relief is or could be claimed. The declaration shall have the force of a final judgment."

[10] Practice Book § 17-55 provides: "A declaratory judgment action may be maintained if all of the following conditions have been met:

"(1) The party seeking the declaratory judgment has an interest, legal or equitable, by reason of danger of loss or of uncertainty as to the party's rights or other jural relations;

"(2) There is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement between the parties; and

"(3) In the event that there is another form of proceeding that can provide the party seeking the declaratory judgment immediate redress, the court is of the opinion that such party should be allowed to proceed with the claim for declaratory judgment despite the existence of such alternate procedure."

curing an advisory opinion on moot or abstract questions . . . and would mean that the declaratory judgment statute and rules created substantive rights that did not otherwise exist." (Citations omitted; internal quotation marks omitted.) Id., 116.

Despite these limitations on declaratory judgment actions, neither the statutes nor the Practice Book contain "any restriction upon the power of the court to render judgments determining rights which are contingent upon the happening of some future event. Indeed, a contrary intent is clearly indicated by the provision in the rules authorizing the determination of any fact upon which the existence or nonexistence of any right, power, privilege or immunity does or may depend, whether such right, power, privilege or immunity now exists or will arise in the future. The remedy by means of declaratory judgments is highly remedial and the statute and rules should be accorded a liberal construction to carry out the purposes underlying such judgments. One great purpose is to enable parties to have their differences authoritatively settled in advance of any claimed invasion of rights, that they may guide their actions accordingly and often may be able to keep them within lawful bounds, and so avoid the expense, bitterness of feeling and disturbance of the orderly pursuits of life which are so often the incidents of law suits. Fully to carry out the purposes intended to be served by such judgments, it is sometimes necessary to determine rights which will arise or become complete only in the contingency of some future happening. Even if the right claimed . . . is a contingent one, [it is appropriate for determination in an action for a declaratory judgment if] its present determination [will] serve a very real practical need of the parties for guidance in their future conduct. A construction of our statute and rules which would exclude from the field of their operation the determination of rights, powers, privileges and immuni-

ties which are contingent upon the happening or not happening of some future event would hamper their useful operation. Such a construction does not, however, compel the Superior Court to decide claims of right which are purely hypothetical or are not of consequence as guides to the present conduct of the parties. The second of the limitations upon the exercise of the power contained in the rules is designed to cover just such situations. It provides that there must be an actual, bona fide and substantial question or issue in dispute, or a substantial uncertainty of legal relations which requires settlement." *Sigal* v. *Wise*, 114 Conn. 297, 301–302, 158 A. 891 (1932).

"It is a basic principle of our law . . . that the plaintiffs must have standing in order for a court to have jurisdiction to render a declaratory judgment." (Internal quotation marks omitted.) *St. George* v. *Gordon*, 264 Conn. 538, 546, 825 A.2d 90 (2003). "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . . [Because] [s]tanding requires no more than a colorable claim of injury . . . a [party] ordinarily establishes . . . standing by allegations of injury [that he or she has suffered or is likely to suffer]. Similarly, standing exists to attempt to vindicate arguably protected interests." (Internal quotation marks omitted.) *Wilcox* v. *Webster Ins., Inc.*, 294 Conn. 206, 214, 982 A.2d 1053 (2009).

"[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor . . . clearly to allege facts demonstrating that he is a proper party to invoke judi-

cial resolution of the dispute. . . . It is well established that, in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged. . . . Because a determination regarding the trial court's subject matter jurisdiction raises a question of law, our review is plenary." (Citations omitted; internal quotation marks omitted.) Id., 213–14.

With these principles in mind, we turn to the questions of whether the plaintiff in the present case has standing to bring this action for a declaratory judgment and whether her claims were ripe for adjudication when brought. We answer both questions in the affirmative. First, we agree with the plaintiff that there is a "substantial question . . . or a substantial uncertainty" as to whether she meets the qualifications contained in § 3-124 and whether the statute is constitutional. (Internal quotation marks omitted.) *Wilson* v. *Kelley*, supra, 224 Conn. 115. The plaintiff contends that the application of legal judgment and skills to specific facts and circumstances constitutes the practice of law under § 3-124, and that, to meet that provision's "active practice" requirement, it is sufficient to have engaged in some form of legal practice as a member of the bar of this state, "although not necessarily doing so in a courtroom, or on a continuing basis, or with any particular degree of frequency or intensity," and that a narrower construction of § 3-124 would violate article sixth, § 10, of the Connecticut constitution. The attorney general takes no position on the meaning of § 3-124, but contends that, regardless of its meaning, it is constitutional. The intervening defendant contends that § 3-124 requires that the attorney general must have been an active litigator for ten years and that it is constitutional.

Second, the present action seeks relief that would be available in a "cause of action that would be cognizable in a nondeclaratory suit." *Wilson* v. *Kelley*, supra,

224 Conn. 116. Specifically, one seeking judicial review of a person's qualifications to serve in public office may bring a quo warranto action pursuant to General Statutes § 52-491.[11] See *Carleton* v. *Civil Service Commission*, 10 Conn. App. 209, 215, 522 A.2d 825 (1987) ("[a] quo warranto action seeks to oust an illegal incumbent from public office"). Moreover, we agree with the plaintiff that her declared intention to run for the office of attorney general and her particular interest in avoiding the great effort and expense of running for that office if her qualifications to serve in that office could be successfully challenged upon her election are sufficient to confer standing on her to bring this action.

Finally, although we recognize that a quo warranto action would not be ripe until the plaintiff actually took office,[12] this court has held that "[o]ne great purpose [of a declaratory judgment action] is to enable parties to have their differences authoritatively settled in advance of any claimed invasion of rights, that they may guide their actions accordingly and often may be able to keep them within lawful bounds . . . ." *Sigal* v. *Wise*, supra, 114 Conn. 301. In light of the potential injury to the plaintiff's interests if her claims are not adjudicated until after the election, as well as the potential injury to the public's interest in avoiding voter confusion and disruptions in the election process, including the possibility of a vacancy in the office of attorney general, we conclude that the action was ripe when it

---

[11] General Statutes § 52-491 provides: "When any person or corporation usurps the exercise of any office, franchise or jurisdiction, the Superior Court may proceed, on a complaint in the nature of a quo warranto, to punish such person or corporation for such usurpation, according to the course of the common law and may proceed therein and render judgment according to the course of the common law."

[12] See *Broyles* v. *Commonwealth*, 309 Ky. 837, 839–40, 219 S.W.2d 52 (1949); *State ex rel. Holmes* v. *Griffin*, 667 So. 2d 1319, 1325 (Miss. 1995); *State ex rel. Quick-Ruben* v. *Verharen*, 136 Wn. 2d 888, 901, 969 P.2d 64 (1998).

was brought even though the plaintiff had not yet been nominated or elected to the office of attorney general. See *Kneip* v. *Herseth*, 87 S.D. 642, 649, 214 N.W.2d 93 (1974) (Declaratory judgment actions involving a determination of eligibility for public office "resolve the uncertainty surrounding a person's candidacy by determining his status at a timely point. They prevent the watering down of the voter franchise by explaining who could run before a vote was irretrievably lost."); id., 652 (because purpose of declaratory judgment "is to afford security and relief against uncertainty, attempting to avoid litigation which results from the destruction of peace, with a view toward declaring rights rather than executing them, then before they are infringed upon voting and candidacy rights or status should be determined"); see also *Sigal* v. *Wise*, supra, 302 ("[a] construction of our statute and rules which would exclude from the field of their operation the determination of rights, powers, privileges and immunities which are contingent upon the happening or not happening of some future event would hamper their useful operation"). Accordingly, we conclude that the trial court had subject matter jurisdiction over the plaintiff's claims.

II

We next address the intervening defendant's claim that the trial court improperly determined that the plaintiff's performance of her duties as the secretary of the state constituted the active practice of law under § 3-124. Specifically, the intervening defendant claims that, to be eligible to serve as the attorney general under § 3-124, a candidate must have ten years experience in litigating cases in court. The intervening defendant further claims that, even if litigation experience is not required, the plaintiff did not have "ten years' active practice at the bar of this state" because she has not, on behalf of clients and as her primary means of livelihood,

engaged in conduct that required a high degree of legal skill for ten years. We agree with both claims.

The trial court found the following additional facts that are relevant to our resolution of this claim.[13] In her capacity as the secretary of the state, the plaintiff consults with the attorneys on her staff[14] on a variety of legal matters, including requests from local election officials, political candidates and party officials for declaratory rulings pursuant to § 9-3 and instructions and opinions concerning the administration of elections and primaries under state election law. For example, in a declaratory ruling issued to all registrars of voters, mayors, first selectmen, town clerks and members of the General Assembly, the plaintiff formally banned the continued use of lever voting machines in Connecticut in order to comply with state and federal law. In another ruling, the plaintiff, relying on an opinion from the attorney general, responded to questions from a person who was circulating nominating petitions for an independent political party regarding the validity of the petitions. The trial court found that, in each of these cases, "the plaintiff was personally involved in finding answers to the legal question posed, evaluating input sought from other attorneys on these questions, and ultimately deciding on the substance and final language of the ruling." The trial court concluded that these activities constituted the practice of law and that the plaintiff's clients in each case were the state and the general public.

---

[13] Our recitation of facts includes a number of undisputed facts that the trial court did not expressly find.

[14] The staff of the office of the secretary of the state is divided into four divisions and one department, namely, the commercial recording division, with a staff of forty-one persons, including three attorneys; the management and support division, with a staff of eighteen persons; the elections division, with a staff of eleven persons, including three attorneys; the information technology department, with a staff of five persons; and the executive staff of nine persons, headed by an attorney.

The plaintiff also collaborated with the attorneys on her staff to formulate answers to questions from local election officials regarding the proper conduct of elections. The office of the secretary of the state receives numerous requests for such advice every day, especially in the days leading up to an election. In one instance, the plaintiff received a telephone call from the mayor of Hartford inquiring what to do about a public school principal's plan to close his school, which was a polling place, before the polls closed on election day. The plaintiff advised the mayor that he should prevent the planned closure because an established polling place cannot be moved to another location without providing reasonable notice to local voters before election day. In another instance, the plaintiff received an inquiry from the first selectman of the town of Suffield as to whether proper procedures had been followed with respect to the conduct of a postelection recount. The plaintiff and two attorneys on her staff responded to the inquiry by telephone and the plaintiff asked one of the attorneys to send a confirmatory letter to the first selectman. The trial court concluded that these activities also constituted the practice of law and that the plaintiff's clients in these instances were the state and its citizens.

Previous secretaries of the state who were not attorneys, and members of their staffs who were not attorneys, provided similar information to local election officials in the past. The office of the secretary of the state currently has no established protocol requiring that the plaintiff or another attorney on her staff approve any declaratory ruling, instruction or opinion concerning state elections law before it is issued. The office does not keep formal records of the declaratory rulings, instructions, opinions or advice that it has provided.

In addition to providing declaratory rulings and answering requests for advice on matters related to elections, the plaintiff and other attorneys on her staff have monitored, implemented and taken positions on new legislation that could affect the ability of the office of the secretary of the state to perform its core functions and have advocated for legal reform in areas relevant to the functions of her office. For example, the plaintiff played an active role in lobbying Connecticut's federal congressional delegation to resist the passage of legislation that would burden her office with new reporting responsibilities concerning persons suspected of terrorism and that would require attorneys to report their suspicions about the identities and activities of their own clients to federal homeland security officials. She also lobbied the Veterans Administration to change its policy prohibiting state officials from conducting voter registration and information programs in Veterans Administration hospitals. In addition, she supported legislation that made it easier for military personnel serving overseas to obtain absentee ballots and to vote. Finally, the plaintiff has been heavily involved in implementing the Help America Vote Act of 2002, 42 U.S.C. § 15301 et seq., actions which required interpreting federal law and advising state legislators and others of her conclusions. The trial court concluded that, although many of these activities did not constitute the practice of law, the plaintiff's "efforts to monitor federal legislation and keep the General Assembly abreast of new or impending federal legislation that would or might require compliance with federal standards by the state" constituted the practice of law and that her clients were the state and its citizens.[15]

---

[15] The trial court rejected the plaintiff's claims that she had engaged in the practice of law when she responded to requests from her constituents for legal advice and when she managed and evaluated her staff attorneys. The plaintiff does not challenge these conclusions on appeal.

We begin our analysis of the intervening defendant's challenge to the trial court's interpretation of § 3-124 with the standard of review. The meaning of § 3-124 is a question of statutory interpretation and therefore our review is plenary. *Grady* v. *Somers*, 294 Conn. 324, 332, 984 A.2d 684 (2009). "The principles that govern statutory construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) Id., 332–33.

None of the parties in the present case claims that the meaning of the phrase "an attorney at law of at least ten years' active practice at the bar of this state"; General Statutes § 3-124; is clear and unambiguous, and we conclude that it is not. Indeed, this court previously has stated that, "because of the manifold activities which might be held included in the phrase 'practice of law,' an all-inclusive definition is difficult, if not impossible, of formulation." *Grievance Committee* v.

*Dacey,* 154 Conn. 129, 147, 222 A.2d 339 (1966), appeal dismissed, 386 U.S. 683, 87 S. Ct. 1325, 18 L. Ed. 2d 404 (1967); see also id., 145 ("Attempts to define the practice of law have not been particularly successful. The reason for this is the broad field covered." [Internal quotation marks omitted.]). Thus, we may "look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Grady* v. *Somers,* supra, 294 Conn. 333.

"A principle which is foundational to our system is that the inherent powers of government reside in the people. This is given expression in the right to vote, and thus to choose the public officials who will serve them; and the correlative right of citizens to aspire to public office and serve therein if so chosen." *Cannon* v. *Gardner,* 611 P.2d 1207, 1211 (Utah 1980). Accordingly, statutory limitations on eligibility to run for public office should be liberally construed, and any ambiguities should be resolved in favor of a candidate's eligibility. See *Carter* v. *Commission on Qualifications of Judicial Appointments,* 14 Cal. 2d 179, 182, 93 P.2d 140 (1939) ("[a]mbiguities are to be resolved in favor of eligibility to office"); *Scharn* v. *Ecker,* 88 S.D. 255, 258, 218 N.W.2d 478 (1974) ("[t]here is a presumption in favor of eligibility of one who has been elected or appointed to public office, and any doubt as to the eligibility of any person to hold an office must be resolved against the doubt" [internal quotation marks omitted]); *Cannon* v. *Gardner,* supra, 1211 (statutes addressing right to hold public office "should receive a liberal construction in favor of assuring . . . the right to aspire to and hold public office"); *Gerberding* v. *Munro,* 134 Wn. 2d 188, 202, 949 P.2d 1366 (1998) ("eligi-

bility to an office . . . is to be presumed rather than to be denied, and . . . any doubt as to the eligibility of any person to hold an office must be resolved against the doubt" [internal quotation marks omitted]); *Cathcart* v. *Meyer*, 88 P.3d 1050, 1070 (Wyo. 2004) ("there is a strong presumption in favor of eligibility for office").

With these principles in mind, we turn to a review of the circumstances surrounding the enactment of § 3-124 and the legislative policy that it was designed to implement. Section 3-124 was enacted in 1897, when the office of attorney general was created. See Public Acts 1897, c. CXCI, § 3 (P.A. 191).[16] Before the enactment of P.A. 191, state officers and agencies confronted with legal questions or actions were required to retain private counsel to resolve the questions and to represent the officers and agencies in legal proceedings. See H. Cohn, "The Creation and Evolution of the Office of Connecticut Attorney General," 81 Conn. B.J. 345, 346 (2007). Public Act 191 required the attorney general to take over these duties, including appearing for the various offices and agencies in "all suits and other civil proceedings" and bringing all actions for them. See P.A. 191, § 2.[17] Because the bulk of the attorney general's

---

[16] Public Act 191, § 3, provides: "The attorney-general shall be an elector of this state, and an attorney-at-law of at least ten years' active practice at the bar of this state."

[17] Public Act 191, § 2, provides: "The attorney-general shall have general supervision over all legal matters in which the state is an interested party, except those legal matters over which the state's attorneys have direction. He shall advise and assist the state's attorneys if they so request. He shall appear for the state, the governor, the lieutenant-governor, the secretary, the treasurer, and the comptroller, and for all heads of departments and state boards, commissioners, agents, inspectors, librarian, committees, auditors, chemists, directors, harbor masters, and institutions, in all suits and other civil proceedings, excepting upon criminal recognizances and bail bonds, in which the state is a party or is interested, or in which the official acts and doings of said officers are called in question in any court or other tribunal, as the duties of his office shall require; and all such suits shall be conducted by him or under his direction. When any measure affecting the state treasury shall be pending before any committee of the general assembly, such committee shall give him reasonable notice of the pendency of such

statutory duties involved representing state officers and agencies in court and in other tribunals, it is reasonable to conclude that, in requiring in the same public act that the attorney general be "an attorney-at-law of at least ten years' active practice at the bar of this state"; P.A. 191, § 3; the legislature intended to ensure that the attorney general would have some experience in litigation.

Indeed, when P.A. 191 was enacted, nonattorneys were permitted to engage in much conduct that was "commonly understood to be the practice of law." *Grievance Committee* v. *Payne*, 128 Conn. 325, 330, 22 A.2d 623 (1941). The only activity that nonattorneys were specifically prohibited from engaging in was "plead[ing] at the bar of any court of this State . . . ." General Statutes (1887 Rev.) § 784.[18] See *Grievance Committee* v. *Payne*, supra, 330 ("Prior to 1933 the prohibition of the statute [relating to conduct by nonattorneys] was primarily directed against the appearance in court by persons not admitted to the bar. . . . In that year [the prohibition was] broadened by the addition of the provision that unauthorized persons should not

measure, and he shall appear and take such action as he may deem to be for the best interests of the state, and he shall represent the public interest in the protection of any gifts, legacies, or devises, intended for public or charitable purposes. All legal services required by such officers and boards in matters relating to their official duties shall be performed by the attorney-general or under his direction. All writs, summonses, or other processes served upon such officers shall, forthwith, be transmitted by them to the attorney-general. All suits or other proceedings by them shall be brought by the attorney-general or under his direction. He shall, when required by either branch of the general assembly, give his opinion upon questions of law submitted to him by either of said branches."

[18] General Statutes (1887 Rev.) § 784 provides: "The Superior Court may admit, and cause to be sworn as attorneys, such persons as are qualified therefor, agreeably to the rules established by the judges of said court; and no other person than an attorney, so admitted, shall plead at the bar of any court of this State, except in his own cause; and said judges may establish rules relative to the admission, qualifications, practice, and removal of attorneys."

'practice law.' " [Citations omitted.]).[19] This court has interpreted the phrase "plead at the bar of any court of this state" to mean to appear in court. See id.; see also *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, 145 Conn. 222, 233–34, 140 A.2d 863 (1958). The fact that, when P.A. 191 was enacted, nonattorneys could engage in any conduct that attorneys could engage in *except* appearing in court further supports the interpretation that the requirement of § 3-124 that the attorney general have "ten years' active practice at the bar" meant that the attorney general must have had some experience in active practice *in court*,[20] and that the legislature wanted to ensure that the attorney general would have both the legal status required to appear in

---

[19] See also *Grievance Committee* v. *Dacey*, supra, 154 Conn. 137 (although between 1927 and 1933 laws prohibiting practice of law by nonattorneys "fell short of being a model of good draftsmanship," it was clear that, before 1927, statutes, read literally, "did not forbid the practice of law outside the courts").

[20] The concurring justice contends that we have misapplied this court's holding in *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, supra, 145 Conn. 222, and concludes that because, unlike General Statutes (1887 Rev.) § 784, which refers to the phrase "plead at the bar of any court of this State," § 3-124 refers to "practice at the bar of this state," it is clear that the legislature did not intend that a candidate for attorney general must have litigation experience. Contrary to the concurring justice's suggestion, however, we do not rely on *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, supra, 222, for the proposition that, as a purely linguistic matter, the phrase "practice at the bar of this state" necessarily means practice in the courtroom. Rather, we rely on that case for the proposition that, before 1933, nonattorneys could engage in any conduct that attorneys could engage in *except* appearing in court. Our conclusion that § 3-124 requires a candidate for the office of attorney general to have litigation experience is based primarily on that fact and on the nature of the duties of the attorney general as set forth in P.A. 191, § 2, not on the meaning of the phrase "practice at the bar," considered in a vacuum. Accordingly, although there may be contexts in which the concurring justice's interpretation of the phrase "practice at the bar" would be reasonable, in light of the circumstances surrounding the enactment of P.A. 191, we are not persuaded by his argument that the difference between the language used in General Statutes (1887 Rev.) § 784 and the language used in § 3-124 clearly indicates that the legislature did not intend that a candidate for the office of attorney general must have experience in litigating cases in court.

court on behalf of state officers and agencies—namely, admission to the bar—*and* the practical experience to litigate effectively.

This interpretation is also bolstered by the 1891 edition of Black's Law Dictionary, which defines "attorney at law" as "[a]n advocate, counsel, official agent employed in preparing, managing, and trying cases in the courts. An officer in a court of justice, who is employed by a party in a cause to manage the same for him."[21] Black, Dictionary of Law (2d Ed. 1891). This definition is in contrast to the definition of "attorney," which provides in relevant part: "In the most general sense this term denotes an agent or substitute, or one who is appointed and authorized to act in the place or stead of another." Id. This suggests that, when P.A. 191 was enacted, the term "attorney-at-law" was understood to mean a person who litigated cases in court.

We conclude, therefore, that, as used in § 3-124, the phrase "attorney at law of at least ten years' active practice at the bar of this state" means an attorney with at least some experience litigating cases in court. Although the presumption of eligibility might require this court to conclude that an attorney who has not practiced exclusively or even primarily as a litigator for at least ten years is qualified to hold the office of attorney general under § 3-124, the presumption does not authorize us to ignore the clear intent of the legislature that the attorney general must have some measure of experience in trying cases.[22] Because it is undisputed that the plaintiff has *no* experience representing per-

---

[21] The 2009 edition of Black's Law Dictionary does not contain a separate definition for "attorney at law," but notes that "[a] person who practices law" may be termed an "attorney-at-law." Black's Law Dictionary (9th Ed. 2009). This is distinct from "one who is designated to transact business for another," who may be termed an "attorney-in-fact." Id.

[22] We recognize that the fact that, in 1897, the sole activity that required admission to the bar of this state was appearing in this state's courts does not mean that persons who were admitted to the bar would engage exclusively, or even primarily, in that activity. The fact that the legislature man-

sons in court, we must conclude that she does not meet the eligibility requirements of § 3-124.[23]

dated that the attorney general must have a legal status the sole purpose of which was to authorize him or her to appear in court does imply, however, that the legislature intended that, to be qualified to serve in that office, a person must have engaged in that activity. To illustrate, if all persons are authorized to do activities A, B and C, and only certain persons are authorized to do activity D, and if the legislature were to specify that only persons who are authorized to do D are eligible for a particular office, it would be reasonable to conclude that the legislature believed that the ability to engage in activity D was crucial to the proper functioning of the office and that a requirement that a person had been engaged in the "active practice" of his profession would include the active practice of D, even though A, B and C are also typical activities of the profession. Thus, a person who is authorized to do A, B, C and D, but who actually does *only* A, B and C, would not be qualified.

[23] In support of its conclusion that the phrase "practice at the bar of this state" means "practice of law in Connecticut, as a member of the Connecticut bar," and not practice in court, the trial court relied on *Abrams v. Lamone*, 398 Md. 146, 919 A.2d 1223 (2007). In *Abrams*, the Court of Appeals of Maryland construed a provision of the Maryland constitution requiring that the attorney general must have " 'practiced [l]aw in [the state of Maryland] for at least ten years.' " Id., 151 n.2. The court noted that, "[b]ecause the [a]ttorney [g]eneral was, and is, intended to be the foremost lawyer for the [s]tate, it is not surprising that a candidate for that office would be required to have more qualification than simply a bar membership, that it would be required that a person aspiring to that position would be required to be both learned in the law, as evidenced by his or her bar membership, and experienced in its practice, as reflected in his or her length of practice." Id., 194. The court also noted that, during the debate on the constitutional provision, a constitutional delegate had stated that " '[the citizens of Maryland] *must have for the attorney general a man who is* accustomed to trying cases, or he will not be fit for the office.' " (Emphasis in original.) Id., 195. Another delegate had stated that " 'a gentleman may be learned in the law, and yet not knowing about the duties of attorney general. I think ten years is short enough time to require of one who will be called upon to apply himself to *the practice of law in all its branches*.' " (Emphasis in original.) Id., 196. The court stated that, although "there may be instances of brilliant attorneys who could perform the duties of the [a]ttorney [g]eneral without ten years of bar membership, the framers felt secure in promoting a seasoned practicing attorney for the position, one who was admitted to the Maryland [b]ar and had, in fact, practiced for the prescribed period." Id., 196–97. The court further stated that, "[i]n order for the [a]ttorney [g]eneral to discharge the various duties prescribed [in the Maryland constitution], he or she would have to be not merely steeped in the law, generally, but steeped in Maryland law, both as a member of its bar and as an active practitioner who, as a result, has acquired a familiarity with the relevant procedures enveloped therein. Given the [a]ttorney [g]eneral's responsibility

The plaintiff claims, however, that "the job of a modern attorney general is far different" than the job in 1897 because the current attorney general "supervises a staff of experienced litigators and provides policy direction for the office . . . ." She contends that "the fulfillment of those functions does not require ten years of experience personally trying cases." We note, however, that General Statutes § 3-125[24] sets forth substan-

for litigation and transactions on behalf of the [s]tate in state courts, coupled with his or her administrative duties, it was quite logical for the framers to require that candidates for the office of the [a]ttorney [g]eneral to have practiced law in the [s]tate for ten years, thereby ensuring that they are conversant and familiar with Maryland law and its practice." Id., 206–207. The court ultimately concluded, however, "that a person may be regarded as practicing law even if the person never appears in *any* court." (Emphasis added.) Id., 208.

We agree with the court's observations in *Abrams* concerning the role of the attorney general, which is substantially the same in Maryland and Connecticut; compare P.A. 191, § 2, and Md. Const., art. V, § 3 (a); and with its remarks concerning the general requirements to serve effectively in that office. We are not persuaded, however, that the court's ultimate conclusion that the Maryland constitution does not require that the attorney general has had litigation experience should guide our construction of § 3-124. Rather, in light of: (1) the Connecticut attorney general's primary role as the state's legal representative in court; (2) the fact that, unlike Maryland's constitutional provision, § 3-124 requires that the attorney general be an "attorney at law," which, when the statute was enacted, meant an attorney who litigated cases in court; and (3) the fact that, when § 3-124 was enacted, the only activity that required admission to the bar of this state was appearing in the courts of this state, we must conclude that the legislature intended that the phrase "active practice at the bar of this state" would include litigating cases in court.

[24] General Statutes § 3-125 provides in relevant part: "The Attorney General shall have general supervision over all legal matters in which the state is an interested party, except those legal matters over which prosecuting officers have direction. He shall appear for the state, the Governor, the Lieutenant Governor, the Secretary, the Treasurer and the Comptroller, and for all heads of departments and state boards, commissioners, agents, inspectors, committees, auditors, chemists, directors, harbor masters, and institutions and for the State Librarian in all suits and other civil proceedings, except upon criminal recognizances and bail bonds, in which the state is a party or is interested, or in which the official acts and doings of said officers are called in question, and for all members of the state House of Representatives and the state Senate in all suits and other civil proceedings brought against them involving their official acts and doings in the discharge of their duties as legislators, in any court or other tribunal, as the duties of his office

tially the same duties as does P.A. 191, § 2. Accordingly, even if we were to assume that the original meaning of § 3-124 could change to reflect the changing duties of the attorney general without any formal amendment to the statute, the legislature has not seen fit to relieve the office of its original duties. Indeed, as we explain more fully in part III of this opinion, the duties of the attorney general have expanded and become more complex since the office was created. Although the attorney general may not personally carry out the statutory duties of the office in every matter that comes before it, by maintaining the text of § 3-125, the legislature has

require; and all such suits shall be conducted by him or under his direction. When any measure affecting the State Treasury is pending before any committee of the General Assembly, such committee shall give him reasonable notice of the pendency of such measure, and he shall appear and take such action as he deems to be for the best interests of the state, and he shall represent the public interest in the protection of any gifts, legacies or devises intended for public or charitable purposes. All legal services required by such officers and boards in matters relating to their official duties shall be performed by the Attorney General or under his direction. All writs, summonses or other processes served upon such officers and legislators shall, forthwith, be transmitted by them to the Attorney General. All suits or other proceedings by such officers shall be brought by the Attorney General or under his direction. He shall, when required by either house of the General Assembly or when requested by the president pro tempore of the Senate, the speaker of the House of Representatives, or the majority leader or the minority leader of the Senate or House of Representatives, give his opinion upon questions of law submitted to him by either of said houses or any of said leaders. He shall advise or give his opinion to the head of any executive department or any state board or commission upon any question of law submitted to him. He may procure such assistance as he may require. Whenever a trustee, under the provisions of any charitable trust described in section 45a-514, is required by statute to give a bond for the performance of his duties as trustee, the Attorney General may cause a petition to be lodged with the probate court of the district in which such trust property is situated, or where any of the trustees reside, for the fixing, accepting and approving of a bond to the state, conditioned for the proper discharge of the duties of such trust, which bond shall be filed in the office of such probate court. The Attorney General shall prepare a topical and chronological cross-index of all legal opinions issued by the office of the Attorney General and shall, from time to time, update the same."

demonstrated that it continues to expect him or her to be legally authorized and practically qualified to do so.

Moreover, even if we were to construe § 3-124 to incorporate a broader, more general understanding of the practice of law, we would still conclude that the plaintiff does not meet that statute's requirements. This court previously has held that, in determining whether certain conduct constitutes the practice of law, the decisive question is whether the conduct is "commonly understood to be the practice of law." *Grievance Committee* v. *Payne,* supra, 128 Conn. 330; see also *Statewide Grievance Committee* v. *Patton,* 239 Conn. 251, 254, 683 A.2d 1359 (1996). In making this determination, this court has considered a number of factors. In *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* supra, 145 Conn. 235, this court held that functions that "require . . . a high degree of legal skill and great capacity for adaptation to difficult and complex situations," or are "performed with the possibility of litigation in mind," may constitute the practice of law. See also *Statewide Grievance Committee* v. *Patton,* supra, 254–55 (same); *Grievance Committee* v. *Payne,* supra, 329 (function that was "highly technical and [would] often [demand] the entire time and study of a specialist" constituted practice of law). In addition, this court has suggested that, for conduct to constitute the practice of law, the conduct must be undertaken on behalf of a client. See *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* supra, 236 ("acts and practices [that were primarily for the benefit of the defendants themselves] did not constitute the practice of law"); see also id., 234–35 (functions that require good moral character, capable of "undivided allegiance, a conspicuous degree of faithfulness and disinterestedness, absolute integrity and utter renunciation of every personal advantage conflicting in any way directly or indirectly with the interests of [the] client,"

constitute "customary functions of attorneys and counselors at law outside of courts").

Moreover, although these cases do not address the issue, because § 3-124 sets forth a competency requirement, we conclude that it necessarily contains a quantitative component.[25] The trial court's conclusion that the phrase "at least ten years' active practice at the bar of this state" does not require "any particular degree of frequency or intensity" effectively reads the "ten years'" language out of the statute. Indeed, if we were to accept this interpretation literally, that would mean that an attorney who had engaged in the practice of

---

[25] The plaintiff claims that these cases support the trial court's interpretation that her use of her legal skills and training to solve complex problems and her provision of legal advice to her client, the state, constitute the practice of law under § 3-124, and that the statute contains no quantitative component. We note, however, that these cases did not involve the application of § 3-124. Rather, they addressed the question of whether a person had engaged in the unauthorized practice of law in violation of General Statutes § 51-88 or its predecessors. The purpose of § 51-88 is, presumably, to protect members of the public from having their rights prejudiced by relying on the legal advice of persons who are untrained and unskilled in the law and are not bound by any professional code of ethics. See *In re Application of R.G.S.*, 312 Md. 626, 638, 541 A.2d 977 (1988) ("[t]he goal of the prohibition against unauthorized practice is to protect the public from being preyed upon by those not competent to practice law—from incompetent, unethical, or irresponsible representation"). Because the public policy underlying § 51-88 is implicated if a nonattorney provides legal advice or represents another person in court on a single occasion, such conduct may constitute the practice of law under § 51-88.

In contrast, § 3-124 was intended to ensure that the attorney general has sufficient training and experience to represent the state effectively in court and to provide it with competent legal advice. The fact that an attorney has provided legal advice on isolated occasions does not mean that he or she has sufficient experience for these purposes. We conclude, therefore, that conduct that constitutes the unauthorized practice of law under § 51-88 does not necessarily constitute the active practice of law under § 3-124. Cf. *In re Application of R.G.S.*, supra, 312 Md. 637 ("[t]he words practice of law may have an entirely different meaning in a statute designed to prevent the practice of law by one not qualified to do so, from that which the same expression should have in determining qualification to hold judicial office" [internal quotation marks omitted]).

law in a single instance ten years earlier would be qualified to represent the state and all of its officers and agencies in court. Although the determination as to whether an attorney has engaged regularly in the practice of law as the primary means of earning a livelihood may be a matter of judgment, and doubts must be resolved in favor of the person seeking the office, we cannot conclude that the legislature intended that a person with that minimal degree of experience in the practice of law would be qualified to serve as the attorney general.

This conclusion is bolstered by a review of cases involving rules permitting a member of the bar of another state to seek admission to the bar of the forum state if he or she has sufficient experience in the practice of law. For example, in *Attorney Grievance Committee* v. *Keehan*, 311 Md. 161, 165, 533 A.2d 278 (1987), the Court of Appeals of Maryland construed a rule that allowed a member of the bar of another state to seek admission to the Maryland bar if "for at least five of the seven years immediately preceding the filing of his petition [the petitioner] has been regularly engaged . . . as a practitioner of law . . . ." (Internal quotation marks omitted.) The rules defined "practitioner of law" as "a member of the [b]ar of another [s]tate . . . who throughout the period specified in the petition has regularly engaged in the practice of law in such jurisdiction as the principal means of earning his livelihood and whose entire professional experience and responsibilities have been sufficient to satisfy the [b]oard [of law examiners] that the petitioner should be admitted . . . ." (Internal quotation marks omitted.) Id. The petitioner in the case had been admitted to the bar in Pennsylvania and, thereafter, had been employed as a claims adjuster by an insurance company for ten years. Id., 164. For five of those years he had "shared a law office gratuitously in York, Pennsylvania," where his practice

was "minimal . . . ." Id. Specifically, he had handled ten to fifteen cases per year and had worked approximately fifteen hours per week in the law office. Id., 168. When the petitioner applied for membership in the Maryland bar, he failed to disclose his primary employment as a claims adjuster and described himself as a "sole practitioner." Id., 166. As a result, the attorney grievance commission found that he had "failed to disclose a material fact requested in connection with . . . his application for admission to the bar" in violation of the Maryland Code of Professional Responsibility; id., 163; a finding with which the trial court agreed. Id.

On appeal, the Court of Appeals of Maryland concluded that "[t]he reason for [the rule allowing admission of attorneys who have regularly practiced in another state] rests on the assumption that a lawyer who has regularly engaged in the practice of law, as a chief means of earning the lawyer's living over a period of years, has sufficient legal knowledge to demonstrate at least minimum competence . . . ." Id., 167. The court concluded that the petitioner's legal experience was "desultory [and] simply does not show one who throughout the period specified in the petition has regularly engaged in the practice of law . . . as the principal means of earning his livelihood . . . ." (Internal quotation marks omitted.) Id., 168. Accordingly, it affirmed the judgment of the trial court. Id., 169–70; see also *In re Application of Stormont*, 238 Kan. 627, 628–29, 712 P.2d 1279 (1986) (because purpose of rule requiring that applicant to bar have "actively performed legal services for which a license to practice law is required" was to ensure "an acceptable level of professional ethics and knowledge," "[t]he occasional practice of law in another jurisdiction" did not satisfy rule [internal quotation marks omitted]); *In re Stanton*, 828 A.2d 529, 530 (R.I. 2003) (for purposes of rule governing admission to bar, requirement that applicant had been

engaged in active practice of law requires "a showing that the legal activities of the applicant were pursued on a full-time basis and constituted his regular business" [internal quotation marks omitted]); *State ex rel. Laughlin* v. *Washington State Bar Assn.*, 26 Wn. 2d 914, 927, 176 P.2d 301 (1947) (as used in rule governing admission to bar, "actual practice" means "the opposite of casual or occasional or clandestine practice and carries with it the thought of active, open and notorious engagement in a business, vocation, or profession" [internal quotation marks omitted]); *In re Pierce*, 189 Wis. 441, 452, 207 N.W. 966 (1926) (as used in rule governing admission to bar, " 'actual practice' requires, and must command, a substantial portion of the working time of a practitioner").[26]

---

[26] But see *In re Application of Slade*, 169 Conn. 677, 363 A.2d 1099 (1975). In that case, an applicant sought admission to the bar of this state pursuant to a provision of the rules of practice that required applicants to have "actually practiced law in the highest court of original jurisdiction in one or more states . . . for at least five years immediately preceding the date" of the application. (Internal quotation marks omitted.) Id., 679. The applicant had appeared before the California court of original highest jurisdiction in just three cases during the prescribed period. Id., 679–80. This court concluded that because the rule did not specify "frequency, extent, type of litigation or its outcome, or [suggest] . . . any guidelines or standard by which the standing committee might determine the competency of the applicant's conduct of the litigation in which he appeared," the county standing committee for admissions had no discretion to determine whether the applicant had satisfied the requirements of the rule, but it was required to conclude she did. Id., 681–82. In support of this conclusion, this court relied on its holding in *In re Application of Dodd*, 132 Conn. 237, 43 A.2d 224 (1945), that a Practice Book requirement that an applicant "shall have actually practiced for ten years in [the highest court of original jurisdiction]"; id., 241 n.2; was "a specific, concrete condition precedent to the admission of the applicant without examination" and that the bar and the committees on recommendations for admission to the bar had no discretion to waive the requirement. Id., 245.

It is now clear to us, however, that this court's decision in *In re Application of Dodd* does not support our conclusion in *In re Application of Slade*. It does not follow from the fact that the admission committee cannot waive a "specific, concrete" Practice Book requirement for admission to the bar that the admission committee has no discretion to determine whether it has been satisfied. Moreover, as we have indicated, our decision in *In re*

We recognize that, unlike the Maryland Code of Professional Responsibility, § 3-124 does not expressly require that the attorney general have practiced law for ten years as the "principal means of earning his [or her] livelihood . . . ." *Attorney Grievance Committee* v. *Keehan, supra,* 311 Md. 165. Nevertheless, it is clear to us that, in light of the statute's clear purpose of ensuring that the attorney general is competent to represent the state in court and to provide legal advice to the state and all of its officers and agencies, the statute necessarily imposes a quantitative requirement. We conclude, therefore, that the phrase "ten years' active practice at the bar of this state" as used in § 3-124 means that the attorney general must have regularly engaged in the practice of law as a primary means of earning his or her livelihood for at least ten years.

Finally, we conclude that the representation of clients is an essential element of the "active practice at the bar of this state" under § 3-124. See *State Bar Assn.* v. *Connecticut Bank & Trust Co., supra,* 145 Conn. 236 ("acts and practices [that were primarily for the benefit of the defendants themselves] did not constitute the practice of law"). It is reasonable to conclude that, by enacting the statute, the legislature intended to ensure that the attorney general had not only an ingrained knowledge of ethical practices, but also an established record of treating clients with "undivided allegiance, a

---

*Application of Slade* is contrary to the weight of authority holding that, for purposes of rules governing admission to the bar without examination, "practice of law" means regularly practicing law as a means of livelihood, not the occasional practice of law. Indeed, it would appear that, under our decision in *In re Application of Slade,* an applicant to the bar who had appeared in the highest court of original jurisdiction in another state just once in the preceding five years would meet the requirements of the rule. This ignores the durational connotations of the phrase "for . . . five years . . . ." *In re Application of Slade, supra,* 169 Conn. 679. Finally, we note that neither this court nor the Appellate Court ever has relied on *In re Application of Slade* for this proposition. Accordingly, we now overrule our decision in *In re Application of Slade.*

conspicuous degree of faithfulness and disinterestedness, absolute integrity and utter renunciation of every personal advantage conflicting in any way directly or indirectly with the interests of [the] client." Id., 234. The regular representation of clients develops not only legal skills, but also these habitual ethical postures and practices.[27] Both of these components are equally indispensable to the competent practice of law.[28]

With these principles in mind, we turn to the question of whether the plaintiff's performance of her duties as

[27] We recognize that prosecutors do not have a traditional attorney-client relationship with the entity that they represent, namely, the state, because they are not required to give the state their undivided allegiance at the expense of the defendants whom they prosecute. See Rules of Professional Conduct 3.8, commentary ("[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate"). Nevertheless, there can be little doubt that prosecutors are required to exercise "a conspicuous degree of faithfulness and disinterestedness, absolute integrity and utter renunciation of every personal advantage conflicting in any way directly or indirectly" with their prosecutorial responsibilities; *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, supra, 145 Conn. 234; and that, when they prosecute cases, they are engaged in the "active practice" of law as that phrase is used in § 3-124.

[28] In *In re Application of R.G.S.*, supra, 312 Md. 633–34, the court held that, although, "in its ordinary sense," the practice of law means "performing professional services for a specific client," for purposes of a rule allowing a person who had been admitted to the bar of another state and who had regularly practiced law in that state to be admitted to the Maryland bar without taking the bar examination, "the existence of lawyer-client relationships is [not] the sine qua non for the practice of law." (Internal quotation marks omitted.) Rather, because "the purpose of the rule is to require only enough 'practice' (practical experience) to demonstrate no need to take a 'full' bar examination," the fact that the applicant was performing work for a beneficiary, namely, the law firm that had hired him, was sufficient. Id., 634. We do not believe that the court's reasoning in *In re Application of R.G.S.* applies in the present case. For purposes of admission to the bar, the regular practice of law operates as a substitute for taking the bar examination, the purpose of which is to establish that the applicant has the minimum basic legal skills required to practice law. Thus, in determining whether an applicant had practiced law in this context, the focus is on whether the applicant has those minimum legal skills, not on whether the applicant has an established record of ethical practices toward his or her clients (although a record of *unethical* practices would presumably be disqualifying). Section 3-124 clearly demands more than the basic legal skills required to practice law.

the secretary of the state, as found by the trial court, constitute the active practice of law under § 3-124. We first consider whether the plaintiff engaged in the active practice of law when she collaborated with the attorneys on her staff to formulate answers to questions from local election officials regarding the proper conduct of elections and when she issued regulations, declaratory rulings, instructions and opinions on issues of election law under title 9 of the General Statutes. We conclude that these activities did not constitute "ten years' active practice at the bar of this state." General Statutes § 3-124.

First, although the plaintiff's formal training as an attorney occasionally may have been useful to her in carrying out her routine statutory duties pursuant to § 9-4, the evidence does not support a conclusion that the performance of those duties is "commonly understood to be the practice of law"; *Grievance Committee* v. *Payne*, supra, 128 Conn. 330; or that it *requires* the "high degree of legal skill and great capacity for adaptation to difficult and complex situations" that characterizes the practice of law.[29] *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, supra, 145 Conn. 235. Indeed, as the trial court recognized, there is no requirement that the secretary of the state be an attorney, and previous secre-

[29] The trial court noted that the rulings of the secretary of the state, if "in written form . . . shall be presumed as correctly interpreting and effectuating the administration of elections and primaries . . . ." (Internal quotation marks omitted.) To the extent that the trial court believed that this provision implies that the office of the secretary of the state has special legal expertise entitling its rulings to great deference from the courts, we disagree. The legislative history of this provision, which was enacted in 1984; see Public Acts 1984, No. 84-319, § 46; indicates that the provision was intended to clarify that the secretary of the state, rather than the elections commission, has the final word on issues related to elections, except for those pertaining to campaign financing. See 27 H.R. Proc., Pt. 7, 1984 Sess., pp. 2359–63; 27 H.R. Proc., Pt. 16, 1984 Sess., pp. 5826–27. The provision does not mean that, in recognition of the legal expertise inherent in the office of the secretary of the state, the decisions of the secretary of the state are entitled to greater judicial deference than the decisions of other agency heads.

taries of the state have not been attorneys.[30] Nor is there any evidence that the plaintiff's activities were significantly different from the activities engaged in by these nonattorney predecessors.[31]

We note that, to the extent that special legal skills may be required to answer a particular question or to render a particular ruling, the authority to perform these services on behalf of all state agencies, including the secretary of the state, is conferred exclusively on the attorney general under § 3-125. See General Statutes § 3-125 ("[a]ll legal services required by such officers and boards in matters relating to their official duties shall be performed by the Attorney General or under his direction"). It is reasonable to conclude that the legislature conferred this responsibility on the attorney

---

[30] See, e.g., Connecticut State Register and Manual (1996), p. 109 (Miles Rappaport, secretary of state from 1995–1999, was not attorney); Connecticut State Register and Manual (1994), p. 109 (Pauline R. Kezer, secretary of state from 1991–1995, was not attorney); Connecticut State Register and Manual (1990), p. 105 (Julia H. Tashjian, secretary of state from 1983–1991, was not attorney); Connecticut State Register and Manual (1981), p. 105 (Barbara B. Kennelly, secretary of state from 1979–1982, was not attorney); Connecticut State Register and Manual (1978), p. 103 (Gloria Schaffer, secretary of state from 1971–1978, was not attorney); Connecticut State Register and Manual (1970) p. 99 (Ella T. Grasso, secretary of state from 1959–1971, was not attorney).

[31] We recognize that, if performing the routine statutory duties of the secretary of the state were a type of work commonly understood to be the practice of law, the fact that a nonattorney who served as the secretary of the state would be statutorily authorized to perform those duties and, therefore, would not be engaging in the unauthorized practice of law, would not necessarily mean that the plaintiff was not engaged in the practice of law for purposes of § 3-124. Cf. *In re Application of R.G.S.*, supra, 312 Md. 639 (work that was not unauthorized practice of law when performed by nonattorneys was practice of law when performed by attorney); *In re Darlene C.*, 247 Conn. 1, 16–17, 717 A.2d 1242 (1998) (*Borden, J.*, concurring) (arguing that, under principle of necessity, activity that would be practice of law if performed by private attorney was not unauthorized practice of law when performed by state employed nonattorney pursuant to statutory mandate). Nevertheless, the fact that nonattorneys generally are capable of performing the duties of the secretary of the state informs our determination as to whether the performance of those duties is a type of work that constitutes the practice of law in the first instance.

general in recognition of the fact that a state officer responsible for administering a particular statutory scheme typically will not have the legal status or experience to practice law. Thus, it is implicit in § 3-125 that the legislature believes that agency heads, including the secretary of the state, generally are capable of carrying out their routine duties without having the "high degree of legal skill and great capacity for adaptation to difficult and complex situations" that characterizes the practice of law. *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, supra, 145 Conn. 235. Although an agency head should have a deep familiarity with the statutory scheme that he or she is charged with administering, and with the public policies that the scheme is intended to implement, he or she need not have the ability to determine the meaning of an inherently ambiguous statute, to resolve apparent inconsistencies between the scheme and important public policies embodied in other statutory schemes, or to determine whether a particular application of a statute complies with the state and federal constitutions. Indeed, if we were to agree with the plaintiff that, in carrying out her routine responsibilities under § 9-4, she was engaging in the practice of law, then we would have to conclude that every member of every state agency and local commission who is an attorney and who is charged with implementing a statutory and regulatory scheme and with issuing rulings and decisions in accordance with the scheme, is practicing law within the meaning of § 3-124. We do not believe that such an interpretation is consistent with the primary purpose of the statute.[32]

[32] In support of its conclusion to the contrary, the trial court relied on the following case law: *Riddle* v. *Roy*, 126 So. 2d 448, 450–52 (La. 1960) (for purposes of constitutional provision requiring that district attorney had practiced law in state for three years, defendant's occasional representation of clients while in army constituted practice of law); *State ex rel. Schenck* v. *Shattuck*, 1 Ohio St. 3d 272, 274, 439 N.E.2d 891 (1982) (for purposes of statute requiring that judge had engaged in practice of law for six years, service as trial referee constituted practice of law); *State ex rel. Devine* v. *Schwarzwalder*, 165 Ohio St. 447, 452–54, 136 N.E.2d 47 (1956) (for purposes

Second, even if we were to assume that, in carrying out her statutory functions, the plaintiff occasionally engaged in conduct that required a high degree of legal skill and that would, therefore, constitute the unautho-

of statutory provision requiring that municipal judge had engaged in practice of law for five years, service as chief of permit division of Ohio department of liquor control was practice of law); and *State by Reyna* v. *Goldberg*, 604 S.W.2d 549, 553 (Tex. Civ. App. 1980) (service as executive director of district attorney's association, combined with minimal private practice, constituted practice of law for purposes of constitutional requirement that justice of Supreme Court had been practicing lawyer for ten years).

We conclude that these cases are either distinguishable or unpersuasive. In *Riddle* v. *Roy*, supra, 126 So. 2d 451, the court held that "[t]he fact that no clients or legal business cross[es] [an attorney's] threshold can have no [e]ffect on [the] character [of the attorney's work as the practice of law] that he has acquired upon admittance to the bar," a standard that the trial court in the present case rejected. Moreover, the factual findings in that case indicated that the defendant had continuously represented clients during the statutory period. Id., 450. Although the court in *State by Reyna* v. *Goldberg*, supra, 604 S.W.2d 551–53, did not explain what standard it was applying to determine whether the defendant had practiced law for ten years, the factual findings indicated that the defendant had represented clients during the entire period, albeit not always on a full-time basis. Because the courts in these cases found that the attorneys had represented clients, they did not engage in extended analyses of whether the attorneys' activities required a "high degree of legal skill and great capacity for adaptation to difficult and complex situations" that characterizes the practice of law. *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, supra, 145 Conn. 235. Accordingly, they are of little guidance on that question.

In *Schenck* v. *Shattuck*, supra, 1 Ohio St. 3d 372, the court concluded that service as a trial referee constituted the practice of law for purposes of a minimum practice requirement for service as a judge. That does not necessarily mean, however, that such service would constitute the practice of law for purposes of a minimum practice requirement for a practicing attorney.

Finally, in *State ex rel. Devine* v. *Schwarzwalder*, supra, 165 Ohio St. 453, the court held that an attorney's service as the chief of the permit division of the department of liquor control of Ohio constituted the practice of law for purposes of a statutory minimum service requirement for a municipal judge. In support of this conclusion, the court stated that "[t]he practice of law is not limited to the conduct of cases in court. It embraces the preparation of pleadings and other papers incident to actions and special proceedings and the management of such actions and proceedings on behalf of clients before judges and courts, and in addition conveyancing, the preparation of legal instruments of all kinds, and in general all advice to clients and all action taken for them in matters connected with the law." (Internal quotation marks omitted.) Id. We do not agree, however, that the essentially administrative and executive functions of the office, as described in the opinion; see id., 452–53; met this standard.

rized practice of law under General Statutes § 51-88 if performed by a private nonattorney; see footnote 31 of this opinion; we have concluded that the occasional practice of law does not constitute the "active practice" of law under § 3-124. Rather, the active practice of law means the regular practice of law as the primary means of earning a livelihood. The trial court found only four specific instances in which the plaintiff had issued declaratory rulings or provided advice to local officials concerning the conduct of elections.[33] We conclude that this conduct was not sufficient to constitute the active practice of law under § 3-124.[34]

[33] As we have indicated, in one of the declaratory rulings, the plaintiff relied on advice from the attorney general to conclude that an independent political party could not use a certain party designation on its nominating petitions. In the second, she concluded that voting machines that did not create a paper ballot audit trail did not comply with a law that required the use of voting machines that produced a permanent paper record. While we do not dispute the importance of these rulings, we do conclude that they are the types of decisions that easily could be made by a nonattorney who was familiar with election law. In that regard, they are typical of agency decisions that rely exclusively on the statutory scheme that the agency is responsible for administering. We assume for purposes of this opinion, however, that the plaintiff's issuance of these rulings was a type of conduct that may constitute the practice of law.

The plaintiff contends that the two declaratory rulings and the telephone calls to the mayor of Hartford and the first selectman of Suffield were merely examples of activities that she performed on a daily basis. In the absence of any written record of or testimony concerning the specific substance of those daily activities, however, there is no evidentiary support for a conclusion that they constituted the practice of law rather than the routine performance of the plaintiff's statutory duties. Indeed, the fact that there is no written record of the communications between the plaintiff and the local election officials supports a conclusion that the communications were not made on behalf of a client in the plaintiff's capacity as an attorney.

[34] Moreover, it is not entirely clear to us that a person acting in the capacity of the secretary of the state is even authorized to engage in the practice of law. As we have indicated, the legislature has conferred the exclusive authority to provide legal services to state agencies on the attorney general. See General Statutes § 3-125. Although this statute may be interpreted as merely authorizing the attorney general to provide all required legal services, and not as prohibiting the heads of state agencies from relying on their own expertise, the legislature may have had good reasons for requiring a single central office to resolve all legal questions arising before state agencies. We need not address that question in the present case, however.

Finally, we disagree with the trial court's conclusion that, because the plaintiff's activities benefited the state and its citizens, they were the plaintiff's clients when she performed her statutory duties. Rather, we conclude that, in carrying out her duties under § 9-4, the plaintiff, like other agency heads, was executing the public policies of the state as an agent and officer of the state.[35] In other words, she was acting primarily on behalf of her office. See *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, supra, 145 Conn. 236 ("acts and practices [that were primarily for the benefit of the defendants themselves] did not constitute the practice of law"). Although the plaintiff may have had a special duty to the state to faithfully carry out its public policies and statutory directives, that duty arose from her position as an agent and officer of the state, not from a confidential attorney-client relationship between her and the state, or its citizens. In carrying out her responsibilities as the secretary of the state, the plaintiff did not have any of the obligations to the state and the public that an attorney has to a client, such as the obligation to maintain confidentiality, the obligation to abide by the client's decisions, the obligation to obtain the client's informed consent before engaging in a course of conduct or the obligation to avoid representing clients with conflicting interests. See generally Rules of Professional Conduct 1.0 through 1.18. Indeed, it may well be that the interests of a particular citizen or election official to whom the plaintiff had given advice in the form of declaratory rulings or opinions were not identical with the interests of the state or of the general public. It is clear to us that, in giving advice to one person that was intended to benefit another

[35] Thus, when, in the course of carrying out her duties, the plaintiff engaged in conduct that aggrieved another person, the plaintiff was named as a party to the resulting legal action. See, e.g., *Reform Party of Connecticut* v. *Bysiewicz*, 254 Conn. 789, 760 A.2d 1257 (2000). She did not represent the state in the action.

entity, namely, her employer, the plaintiff could not have been practicing law as that term is commonly understood. We recognize that, in making the determination as to whether an attorney regularly has represented clients, all doubts must be resolved in favor of the attorney for purposes of § 3-124. We must conclude in the present case, however, that the state and its citizens were not the plaintiff's clients in any sense of the word. We conclude, therefore, that the plaintiff was not engaged in the practice of law when she collaborated with the attorneys on her staff to formulate answers to questions from local election officials regarding the proper conduct of elections, and when she issued regulations, declaratory rulings, instructions and opinions on issues of election law under title 9 of the General Statutes.

For similar reasons, we conclude that the plaintiff's "efforts to monitor federal legislation and keep the General Assembly abreast of new or impending federal legislation that would or might require compliance with federal standards by the state" did not constitute the practice of law under § 3-124. Again, in carrying out these activities she was executing the duties of her office, not representing a client. It is clear, for example, that if the state or the public had concluded that the plaintiff had misinterpreted federal law, that she had failed to inform the legislature adequately of its requirements, or that she had failed to carry out legislative efforts to comply with federal law, the remedy would not be to sue her for malpractice or to sanction her for violating the Rules of Professional Conduct.[36] See Rules of Professional Conduct 1.1 ("[a] lawyer shall provide

---

[36] Of course, if the plaintiff had engaged in inherently dishonest or deceitful conduct, she could have been subject to judicial sanctions for violating the Rules of Professional Conduct. See Rules of Professional Conduct 8.4 (3). That does not mean, however, that in engaging in such conduct, she was engaging in the practice of law.

competent representation to a client"); id., 1.2 (a) ("a lawyer shall abide by a client's decisions concerning the objectives of representation"). Rather, the remedy would be to elect another secretary of the state. Accordingly, we conclude that the trial court improperly determined that the plaintiff had "ten years' active practice at the bar of this state" under § 3-124.

## III

The plaintiff's final claim is that the trial court's judgment may be affirmed on the alternative ground[37] that § 3-124 is unconstitutional because it conflicts with article sixth, § 10, of the constitution of Connecticut, as amended by articles two and fifteen of the amendments.[38] That section provides that "[e]very elector who has attained the age of eighteen years shall be eligible to any office in the state, but no person who has not attained the age of eighteen shall be eligible therefor, except in cases provided for in this constitution."[39] Conn. Const., amend. XV, § 3. According to the plaintiff,

[37] See Practice Book § 63-4 (a) (1) (A).

[38] The plaintiff raised this claim before the trial court. Because the trial court found dispositive the plaintiff's claim that she met the requirements of § 3-124, it did not decide the constitutional issue. See *Evans* v. *General Motors Corp.*, 277 Conn. 496, 508, 893 A.2d 371 (2006) (courts must refrain from addressing constitutional questions unless their resolution is unavoidable or absolutely necessary to deciding case). Because the plaintiff's argument is a purely legal one, however, deference to the trial court's assessment of it would not have been warranted. See *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, 295 Conn. 240, 310 n.56, 990 A.2d 206 (2010) (agreeing that "state constitutional claims present pure questions of law that do not require factual findings by the trial court"); *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 155, 957 A.2d 407 (2008) (constitutional claims subject to plenary review). Accordingly, it is of no consequence that we consider this claim for the first time on appeal.

[39] Qualifications of "electors" are prescribed by article sixth, § 1, of the constitution of Connecticut, as amended by article nine of the amendments, which provides: "Every citizen of the United States who has attained the age of eighteen years, who is a bona fide resident of the town in which he seeks to be admitted as an elector and who takes such oath, if any, as may be prescribed by law, shall be qualified to be an elector."

article sixth, § 10, is an exclusive prescription of the qualifications a person must possess to be eligible for the office of attorney general and, therefore, the legislature is powerless to require different or additional qualifications by way of statute. Consequently, the plaintiff claims, the requirement of § 3-124 that the attorney general be an attorney-at-law of at least ten years' active practice at the bar of Connecticut is unconstitutional. We are not persuaded.

When determining whether a statutory provision conflicts with the state constitution, this court must begin with a strong presumption of the statute's validity. *Honulik* v. *Greenwich*, 293 Conn. 641, 647, 980 A.2d 845 (2009). "It is well established that a validly enacted statute carries with it a strong presumption of constitutionality, [and that] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . The court will indulge in every presumption in favor of the statute's constitutionality . . . . Therefore, [w]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 500, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007). "It is an extreme act of judicial power to declare a statute unconstitutional. It should be done with great caution and only when the case for invalidity is established beyond a reasonable doubt. . . . It is not enough that a statute goes to the verge of constitutional power. We must be able to see clearly that it goes beyond that power. In case of real doubt a law must be sustained." (Citation omitted; internal quotation marks omitted.) *Honulik* v. *Greenwich*, supra, 647.

"[I]n *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992), we set forth six factors that, to the extent

applicable, are to be considered in construing the contours of our state constitution so that we may reach reasoned and principled results as to its meaning. These factors are: (1) the text of the operative constitutional provision; (2) holdings and dicta of this court and the Appellate Court; (3) persuasive and relevant federal precedent; (4) persuasive sister state decisions; (5) the history of the operative constitutional provision, including the historical constitutional setting and the debates of the framers; and (6) contemporary economic and sociological considerations, including relevant public policies. . . . Although, in *Geisler*, we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven. . . . [Moreover], not every *Geisler* factor is relevant in all cases." (Citation omitted; internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 157, 957 A.2d 407 (2008). Finally, when interpreting constitutional provisions, this court "strive[s] to achieve a workable, commonsense construction that does not frustrate effective governmental functioning, at least where such is not clearly contradicted by application of the [interpretative tools] enumerated in *Geisler*." *Honulik* v. *Greenwich*, supra, 293 Conn. 648 n.10.

We begin with the text of article sixth, § 10, of the constitution of Connecticut, as amended by articles two and fifteen of the amendments. See footnote 2 of this opinion. Pertinently, the provision's minimal qualification requirements, read literally, apply to the holder of "any office in the state . . . except in cases provided for in this constitution." Conn. Const., amend. XV, § 3. The plaintiff argues that the phrase "any office in the state" is unambiguous and plainly means "every office in the state." Article sixth, § 10, has been part of Con-

necticut's constitution since 1818.[40] Prior to 1897, however, the office of attorney general did not exist. Accordingly, the constitutional provision, when originally enacted, could not have been intended specifically to apply to that office. We note in this regard that, "[t]o understand the intent of the instrument it is often necessary to have recourse to the form of government as it had existed before, and did exist at the time of, the adoption of the constitution." *Dowe* v. *Egan*, 133 Conn. 112, 119, 48 A.2d 735 (1946); see id., 119–20 (examining governmental structure prior to 1818 to determine scope of provisions outlining powers of treasurer and comptroller); see also *Walkinshaw* v. *O'Brien*, 130 Conn. 122, 128–29, 32 A.2d 547 (1943) (examining structure of court system prior to 1818 to interpret term " 'inferiour courts' " in article fifth, § 1, of Connecticut constitution).[41] Although the plaintiff

[40] Since then, the qualifications provision has undergone some changes in wording that are not relevant to the present case. Specifically, article sixth, § 4, of the constitution of 1818 provides: "Every elector shall be eligible to any office in this state, except in cases provided for in this constitution." Article sixth, § 2, of the constitution of 1818 set the minimum age of an elector at twenty-one years. Article sixth, § 3, of the constitution of 1955 is worded identically to article sixth, § 4, of the constitution of 1818, and article sixth, § 1, of the constitution of 1955 retains the requirement that an elector be at least twenty-one years old. Article sixth, § 3, became article sixth, § 10, in the constitution of 1965. Subsequently, article sixth, § 10, was amended twice, first in 1970 to read as it does today, only with a minimum qualification age of twenty-one, then again in 1980 to reduce the minimum qualification age to eighteen. See Conn. Const., amend. II, § 3; Conn. Const, amend. XV, § 3.

[41] We also find instructive the line of cases holding that the right to a jury trial, although guaranteed broadly and unconditionally in the state constitution; see Conn. Const., art. I, § 19 ("[t]he right of trial by jury shall remain inviolate"); nevertheless is limited to those types of cases for which a jury trial was available in 1818, the time of the adoption of the constitutional provision (and cases substantially similar thereto). See, e.g., *Evans* v. *General Motors Corp.*, 277 Conn. 496, 509–10, 893 A.2d 371 (2006); *Skinner* v. *Angliker*, 211 Conn. 370, 375–76, 559 A.2d 701 (1989); cf. *State* v. *McKenzie-Adams*, supra, 281 Conn. 511–12 (interpreting state constitution's due process clauses by, inter alia, considering constitutional or quasi-constitutional rights recognized at common law in Connecticut prior to 1818). When a statute limits the right of trial by jury in a type of case that did not exist

argues that the drafters of article sixth, § 10, must have worded the provision broadly with the intent that it apply to future as well as already existing offices, she offers no particular reason why the language used compels that conclusion rather than an equally plausible competing one, namely, that the drafters had in mind only those offices then in existence. Accordingly, we reject the plaintiff's suggestion that the constitutional text at issue is dispositive in answering the question before us. Cf. *State* v. *Gethers*, 197 Conn. 369, 386, 497 A.2d 408 (1985) (rejecting defendant's argument as to "plain meaning" of article first, § 8, because, "[a]lthough the simplicity of the defendant's argument may have some superficial appeal, important questions involving constitutional principles, as a general rule, cannot be so easily solved" [internal quotation marks omitted]).

We turn next to relevant jurisprudence from this state's courts. The limited number of cases implicating article sixth, § 10, or its predecessors, have not construed the qualifications provision literally to apply to "every office in" Connecticut, but instead, have held it applicable only to offices of state government that are constitutional in nature. See *Adams* v. *Rubinow*, 157 Conn. 150, 176–77, 177 n.5, 251 A.2d 49 (1968) (article sixth, § 10, applies only to state constitutional offices and, therefore, does not cover probate judges); *Hackett* v. *New Haven*, 103 Conn. 157, 168, 130 A. 121 (1925) (provision applies only to state constitutional offices and, therefore, does not cover municipal board members); see also *Mills* v. *Gaynor*, 136 Conn. 632, 639, 73 A.2d 823 (1950) (provision inapplicable to town officers); *Scully* v. *Westport*, 20 Conn. Sup. 399, 402, 137

in 1818, therefore, the statute's constitutionality will be sustained. *Swanson* v. *Boschen*, 143 Conn. 159, 166, 120 A.2d 546 (1956). Reading article sixth, § 10, similarly with reference to the state of affairs that existed at the time of its adoption, i.e., as applying only to offices that existed in 1818, suggests that the constitutionality of § 3-124, which sets qualifications for an office that was not created until 1897, should be sustained.

A.2d 352 (1957) (same). "A constitutional office is understood to be one expressly named in and created by [a] constitution, whereas a statutory office is one created by legislation." Annot., 34 A.L.R.2d 161, § 1 (1954); see also 63C Am. Jur. 2d 497, Public Officers and Employees § 15 (2009). Because the office of attorney general is a constitutional one; see part III of this opinion; this factor weighs in favor of the plaintiff's position.

Due to the fact sensitive nature and, therefore, multiple distinguishing characteristics of cases concerning legislative power to prescribe qualifications for public offices, we find little guidance for resolving the issue before us in decisions of our sister states or the federal courts.[42] See annot., supra, 34 A.L.R.2d 163, § 3 (warning at outset "that the terms and general import of the individual state constitutions in their provisions with respect to eligibility for public office generally, and in laying down qualifications or disqualifications for particular offices, and in other relevant provisions, exhibit so many differences from state to state that substantial caution must be observed in extracting general principles or corresponding views from the case law on the present subject, and in considering the applicability of such principles as do emerge"). The particular extrajurisdictional precedent on which the plaintiff relies is readily distinguishable on the basis of key differences in the constitutional language at issue; see, e.g., *State ex rel. Boedigheimer* v. *Welter*, 208 Minn. 338, 340, 293 N.W. 914 (1940) (construing constitutional eligibility provision that explicitly applied to both existing offices *and* those yet to be created);[43] the

---

[42] "[T]he *Geisler* analysis must adapt itself to each particular inquiry . . . [because] [s]ome factors that are extremely relevant and persuasive in one inquiry may yield little or no persuasive information in another inquiry." *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, supra, 295 Conn. 351 (*Schaller, J.*, concurring).

[43] Although the constitutional provision at issue in *State ex rel. Boedigheimer* v. *Welter*, supra, 208 Minn. 340, is reproduced in its entirety in the Minnesota Supreme Court's opinion, we assume that the plaintiff's quotation

offices at issue; see, e.g., *Gerberding* v. *Munro*, supra, 134 Wn. 2d 202–203 (construing constitutional eligibility provisions as they applied to offices that already were in existence at time provisions were adopted); or in the specific historical evidence available that supported the conclusion reached. See, e.g., *U. S. Term Limits, Inc.* v. *Thornton*, 514 U.S. 779, 789–93, 115 S. Ct. 1842, 131 L. Ed. 2d 881 (1995) (restating analysis of *Powell* v. *McCormack*, 395 U.S. 486, 89 S. Ct. 1944, 23 L. Ed. 2d 491 [1969], based on historical evidence of British parliamentary experience, constitutional convention debates concerning federal congressional qualifications clause, postconvention ratification debates and state convention debates);[44] see also *Gerberding* v. *Munro*, supra, 203–204 (analyzing state constitutional convention materials surrounding adoption of eligibility provisions).

The historical circumstances surrounding both article sixth, § 10, and the amendment of another constitutional provision, article fourth, § 1, are unique and particularly useful for deciding the issue at hand. To reiterate, when the predecessor to article sixth, § 10, originated in 1818, the position of attorney general did not exist. As we have indicated, the office of attorney general was created by statute in 1897. P.A. 191, § 1. As we also have indicated, P.A. 191, § 2, defined the powers and duties of the office, assigning to it a broad range of quintessentially legal responsibilities,[45] and

in her brief of the provision as subsequently amended, coupled with the holding of the case construing the earlier version, was inadvertent.

[44] Although the plaintiff focuses exclusively on a discussion of democratic principles included in *Powell* v. *McCormack*, supra, 395 U.S. 547, it is clear that the United States Supreme Court's decision in that case rested heavily on the historical evidence concerning the federal qualifications clauses.

[45] As we have indicated, P.A. 191, § 2, with some additions, is codified today at § 3-125. See footnote 17 of this opinion. Additional powers and duties of the attorney general are prescribed in General Statutes §§ 3-126 through 3-130 and various other sections of the General Statutes, and frequently include the right to institute legal proceedings on behalf of the state.

P.A. 191, § 3, created the eligibility requirements that appear to this date in § 3-124.[46] Because the office of attorney general at its inception clearly was a statutory one, and not a constitutional one, article sixth, § 10, was not implicated. See *Adams* v. *Rubinow*, supra, 157 Conn. 176–77, 177 n.5; *Hackett* v. *New Haven*, supra, 103 Conn. 168. As a general matter, "the legislature has full control over offices created by its enactment of a statute, whereas its power over constitutional offices is limited . . . ." Annot., supra, 34 A.L.R.2d 168, § 4; see also 63C Am. Jur. 2d 498, supra, § 15.

It was not until 1970, by a constitutional amendment approved after a public referendum,[47] that the office of attorney general became a constitutional one. See *Blumenthal* v. *Barnes*, 261 Conn. 434, 443 n.10, 804 A.2d 152 (2002); *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 572, 663 A.2d 317 (1995); *Commission on Special Revenue* v. *Freedom of Information Commission*, 174 Conn. 308, 318–19, 387 A.2d 533 (1978). Specifically, this was accomplished by amending article fourth, § 1, of the constitution,[48] which governs the election of executive branch officers, to

[46] See footnote 1 of this opinion.

[47] Pursuant to article twelfth of the Connecticut constitution, amendments to the constitution may be proposed by any member of the Senate or House of Representatives and, if approved by at least three fourths of the total membership of each chamber at the next legislative session, shall be presented to electors for approval at the next general election. "If it shall appear, in a manner to be provided by law, that a majority of the electors present and voting on such amendment at such election shall have approved such amendment, the same shall be valid, to all intents and purposes, as a part of [the] constitution." Conn. Const., art. XII. The foregoing provision is an alternative route to amending the constitution, in addition to constitutional conventions, which may be called only at specified intervals. Conn. Const., art. XIII, §§ 1, 2.

[48] Article fourth, § 1, of the constitution of Connecticut, as amended by article one of the amendments, provides: "A general election for governor, lieutenant-governor, secretary of the state, treasurer, comptroller and attorney general shall be held on the Tuesday after the first Monday of November, 1974, and quadrennially thereafter."

include the attorney general among the executive branch officers listed.[49]

[49] The intervening defendant submits that the attorney general is not a constitutional officer, arguing that the language in the cited cases so stating is but dicta, and that a reference in the constitution to the attorney general, without any other provisions outlining his powers and duties, did not amount to a creation of a constitutional office. It is true that this court, in *Adams* v. *Rubinow*, supra, 157 Conn. 177, rejected the argument that references in the constitution to judges of probate rendered them constitutional officers. We explained: "Although a judge of probate holds a public office of the state government, he does not hold an office established by the constitution even though his term of office and those who can vote for him are set forth in the constitution." Id.; see also 63C Am. Jur. 2d 497–98, supra, § 15 ("[a] reference in a state constitution to a particular position . . . does not automatically render that position a constitutional office"); 63 Am. Jur. 2d 520, supra, § 45 (same); see also, e.g., *Opinion of the Justices to the House of Representatives*, 240 Mass. 611, 612–13, 135 N.E. 305 (1922).

The legislative history of the amendment to article fourth, § 1, however, albeit limited, strongly suggests that the legislature and the electorate, by proposing and approving the amendment, intended to make the office of attorney general a constitutional office. In introducing House Joint Resolution No. 95, proposing the amendment, Senator David Barry stated that "[t]he purpose of the bill is simply to make the [a]ttorney [g]eneral's office a constitutional officer instead of a statutory officer. Under [the] present [regulations'] constitutional framework, the [a]ttorney [g]eneral is the only one of the elected [s]tate [o]fficials, who is not a [c]onstitutional [o]fficer." 13 S. Proc., Pt. 3, 1969 Sess., pp. 1282–83. Representative Richard Yedziniak provided the same explanation when introducing the resolution in the House, and he added: "The position of [a]ttorney [g]eneral has been, and is, of growing importance, because he is required to represent the [g]overnor and does not serve as an independent agent. Every agency, elective office, and even the General Assembly depends on the office of the [a]ttorney [g]eneral. *It does not seem logical that this powerful office does not have the constitutional provision governing its existence.*" (Emphasis added.) 13 H.R. Proc., Pt. 3, 1969 Sess., p. 1290. Finally, the "explanatory text as to the intent and purpose" of the amendment, which was prepared by the General Assembly's committee on constitutional amendments to include on the referendum ballot, was a verbatim reproduction of Representative Yedziniak's explanation. See General Statutes § 2-30a (a) ("At such time as a proposed constitutional amendment is approved by the General Assembly for presentation to the electors of the state for their consideration at a general election, the Office of Legislative Research shall prepare a concise explanatory text as to the content and purpose of the proposed constitutional amendment subject to the approval of the joint standing committee of the General Assembly having cognizance of constitutional amendments. Upon such approval, the Secretary of the State shall cause such proposed amendment and such explanatory text to be printed and transmitted to the town clerk in each town in the state in sufficient supply for public distribution."). Given the

Aside from the amendment to article fourth, § 1, to include the attorney general in the general elections for state constitutional officers, no other provisions were added to the constitution in 1970, or thereafter, outlining the attorney general's powers and duties. This stands in contrast to the other previously existing constitutional offices enumerated in article fourth, § 1, each of which has particular provisions defining its role and, in some cases, adding further qualifications that one must possess to be eligible for the office. See, e.g., Conn. Const., art. IV, § 5 (general duties of governor); Conn. Const., art. IV, § 22 (general duties of treasurer); Conn. Const., art. IV, § 23 (general duties of secretary); Conn. Const., art. IV, § 24 (general duties of comptroller). The failure of the legislature to propose any additional provision relating to the attorney general, other than that mandating his election, strongly suggests that that body, when proposing that the attorney general be made a constitutional officer, intended to retain for itself the responsibility for defining the specific powers and duties of the office, and accordingly, to incorporate for the time being the existing statutory provisions pertaining to the attorney general. The alternative, that the legislature intended to propose the creation of a constitutional office having no powers and duties, defies common sense. Cf. *Brown* v. *Blake*, 46 Conn. 549, 551 (1879) (concluding that statutory reference to first selectmen formally created office that long had existed informally with certain duties and powers, "unless we impute to the legislature the intention to do no more than to give a name empty of meaning or power").

Accordingly, we conclude that in proposing the amendment to article fourth, § 1, and presenting it to

foregoing explanation, the electorate must have understood that, by approving the referendum, they were making the office of attorney general a constitutional one.

the electorate for approval, the legislature intended to retain for itself the authority to define the minimum qualifications for holders of the office of attorney general, thereby incorporating the existing qualification requirements of § 3-124, and by necessary implication, exempting the position from the preexisting generalized qualifications provision of article sixth, § 10.[50] The alternative, namely, that the legislature intended to make someone as young as eighteen and, more importantly, *a nonattorney*, eligible for the office of attorney general, is wholly implausible. When making the attorney general a constitutional officer, the legislature's stated intent was to elevate and protect the office due to its increasing importance. See footnote 48 of this opinion. The myriad duties of the office since its inception more than seventy years earlier were almost entirely legal ones. See footnote 17 of this opinion. For the legislature, sub silencio, to eliminate the statutory eligibility requirements, particularly the requirement that the officeholder be an experienced attorney, would create the possibility of rendering the office totally ineffective through the election of a candidate unqualified to perform any of its duties. We cannot conclude that the legislature intended such a result.

We turn last to contemporary economic and sociological considerations. The reasons prompting the move to create the office of attorney general, and thereafter to make the office a constitutional one, have not abated,

---

[50] "[A]uthority on the part of a legislature to prescribe qualifications for a constitutional office may be either express, *or implied* and inherent . . . ." (Emphasis added.) Annot., supra, 34 A.L.R.2d 166, § 4. "Sometimes the constitution may be explicit and make the answer [to the question of whether a legislature has power to prescribe eligibility qualifications for a constitutional office] perfectly definite or obvious, but in many jurisdictions it will be found that the existence or nonexistence of legislative power in this respect is a matter which is *left to implication and must be determined by examining and construing the local constitution in the light of general principles of constitutional law*." (Emphasis added.) Id., 163, § 3.

but only have grown. The attorney general's statutory responsibilities have expanded. See General Statutes §§ 3-125 through 3-130; see also, e.g., General Statutes § 17b-301 (prosecution of fraud in public medical assistance programs); General Statutes § 35-32 (enforcement of antitrust laws). The office continues to represent the interests of the state, its citizens and businesses in a wide range of legal matters of great public importance. See Connecticut State Register and Manual (2009), pp. 216–18. (describing fourteen major practice areas of attorney general's office). In a given year, the office is party to tens of thousands of legal actions, and through its various collection and enforcement activities, generates hundreds of millions of dollars of revenue for the state and its citizenry.[51] In short, the continuing importance of the office and its ever expanding role as the state's legal advocate weigh in favor of a conclusion that the legislature intended to retain the requirement of § 3-124 that the office be overseen by an attorney with substantial practice experience.

Our consideration of the *Geisler* factors leads us to conclude that the office of attorney general impliedly is exempt from the general qualification requirements for state constitutional officers prescribed by article sixth, § 10, of the constitution of Connecticut. Consequently, § 3-124, although setting stricter qualifications for the attorney general than those listed in article sixth, § 10, is not unconstitutional.

The judgment of the trial court is reversed and the case is remanded to that court with direction to render

---

[51] For example, during fiscal year 2008–2009, the office of the attorney general completed 15,133 court cases, and another 36,495 remained pending at the close of that fiscal year. Also in fiscal year 2008–2009, the office of the attorney general generated $568,500,339 in revenue. Of that, $237,886,113 was directed to the state's general fund, and $327,032,696 was awarded or paid to consumers. See Digest of Administrative Reports (2008–2009), available at http://www.das.state.ct.us/Digest/Digest_2009/ (last visited October 21, 2010).

a declaratory judgment that the plaintiff fails to satisfy the requirements of § 3-124.

In this opinion KATZ, VERTEFEUILLE, ZARELLA and McLACHLAN, Js., concurred.

BISHOP, J., with whom PALMER, J., joins, concurring. I agree with the majority's analysis concerning the plaintiff's standing to seek declaratory relief, as well as its analysis of the constitutionality of General Statutes § 3-124. I also agree that the plaintiff, Susan Bysiewicz, does not meet the statutory qualifications for the office of attorney general of the state of Connecticut because the trial testimony established that, in her role as the secretary of the state, she did not have clients with whom she had a confidential relationship and to whom she owed a personal duty of loyalty,[1] and her occasional use of legal knowledge to fulfill her responsibilities does not comprise the active practice of law. Because these conclusions resolve the question posed by the plaintiff's declaratory judgment action, I believe we need go no further in interpreting § 3-124. I write separately because I cannot join the majority's determination that § 3-124 also requires that a candidate for the position of attorney general have litigation experience.

I begin my analysis with the language of the statute itself. By its terms, § 3-124 requires that, to be eligible for office, a candidate for the office of attorney general must be "an attorney at law of at least ten years' active practice at the bar of this state." Although acknowledging that the language of the statute is not plain and unambiguous, the majority nevertheless concludes that the terms "attorney at law" and "at the bar of this

[1] In this regard, I am in complete agreement with the distinction made by the majority in footnote 27 regarding the practice of law by prosecutors who, by the nature of their work, represent the state and not individuals or entities to whom they owe an individualized duty of loyalty and confidentiality.

state" mean that, to be eligible, a candidate must have litigation experience. The majority purports to reach this conclusion from the statutory language itself and also by reference to "the circumstances surrounding the enactment of § 3-124 and the legislative policy that it was designed to implement."

I agree with the majority that the language of § 3-124 is not plain and unambiguous. I also believe we are in agreement that the statute, by its terms, does not expressly require an eligible candidate to have litigation experience. The ambiguity in this regard arises from the statutory terms "attorney at law" and "at the bar of this state."

In the absence of plain language, we turn to our rules of statutory construction to discern the statute's meaning. "In seeking to determine [the meaning of the statutory language as applied to the facts of a case], General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Grady* v. *Somers*, 294 Conn. 324, 333, 984 A.2d 684 (2009). In determining legislative intent, however, "[w]e are not at liberty to speculate upon any supposed actual intention of the legislature. We are not at liberty to imagine an intent and bind the letter of the act to that intent; much less can we indulge in the license of striking out and inserting and remodeling with the view of making the letter express an intent which the statute in its native form does not express." (Internal quotation marks omitted.) *State* v. *Faatz*, 83 Conn. 300, 306, 76 A. 295 (1910).

Also, as the majority points out, it is an axiom of statutory interpretation that statutory limitations on eligibility to run for public office should be liberally construed, and any ambiguities should be resolved in favor of eligibility. See *Carter* v. *Commission on Qualifications of Judicial Appointments*, 14 Cal. 2d 179, 182, 93 P.2d 140 (1939). I diverge from the majority because it addresses an issue it need not and, in doing so, it disregards the canon it claims to embrace, namely, that election statutes should be construed liberally in favor of eligibility. Instead, the majority imports into the statute a restriction on eligibility that is neither implied nor expressed by the statute's language.[2]

In reaching its conclusion, the majority determines that the phrase attorney-at-law necessarily means an attorney who appears in court. The majority relies, in large part, on the definition of attorney-at-law set forth in the 1891 edition of Black's Law Dictionary (Black's). Then, Black's defined attorney-at-law as, inter alia, "[a]n advocate, counsel, official agent employed in preparing, managing, and trying cases in court." Black, Dictionary of Law (2d Ed. 1891). Although I do not disagree that Black's is a legitimate reference for an understanding of the term attorney-at-law in 1891, I find Black's definition less persuasive than the United States Supreme Court's near contemporaneous elucidation of the term.

---

[2] There is a paucity of legislative history with respect to § 3-124, and the history that is available does not give any indication whether the legislature intended to require that the attorney general have litigation experience. There is some anecdotal evidence, however, that the impetus for the establishment of the position was to alleviate the expenses being incurred by the various state agencies in seeking legal advice. See Connecticut State Register and Manual (1934) p. 79; Hartford Courant, May 15, 1897, p. 12 and May 21, 1897, p. 6. Additionally, although there was no discussion regarding a requirement for litigation experience, there was discussion in the press regarding the attempt to ensure that the position should not be filled by either a "retained lawyer [or] a bright political hustler." Hartford Courant, May 12, 1897, p. 8, May 14, 1897, p. 8, and May 18, 1897, p. 12.

In 1879, the Supreme Court provided an extensive definition of the term attorney-at-law. In *Savings Bank* v. *Ward*, 100 U.S. 195, 199, 25 L. Ed. 621 (1879), the court stated: "Persons acting professionally in legal formalities, negotiations, or proceedings by the warrant or authority of their clients may be regarded as attorneys-at-law within the meaning of that designation as used in this country; and all such, when they undertake to conduct legal controversies or transactions, profess themselves to be reasonably well acquainted with the law and the rules and practice of the courts, and they are bound to exercise in such proceedings a reasonable degree of care, prudence, diligence, and skill." This definition of the term attorney-at-law does not instruct, nor imply, that an attorney-at-law must be involved in litigation. To the contrary, the Supreme Court's definition had a broad sweep, expressly including attorneys whose practices were transactional in nature and unrelated to controversies.

Additionally, during this same time period, in Connecticut, a commission consisting of judges of the Superior Court developed the first rules of practice resulting in the Practice Act of 1879 (act). The act set forth orders and rules, as well as general rules of practice. The act contained numerous forms illustrating the practice rules, including the manner in which certain claims might properly be pleaded. Relevant to the issue at hand, the sample forms provide examples of pleadings for a number of different actions involving attorneys-at-law as parties. Notably, the examples include a form for bringing an action against an "attorney-at-law" for negligence in examining title. Importantly, in using the term attorney-at-law, the judges of the Superior Court did not distinguish between attorneys who practiced in court, either bringing or defending against actions, and those who were involved in transactional work, in this instance, examining title to property. Thus, it appears

that during the same time period as the passage of the statute in question, the United States Supreme Court and the judges of our state did not consider the term attorney-at-law to relate specifically or exclusively to courtroom practice.

In sum on this point, although we need not decide the precise boundaries of professional activities that could qualify as being conducted by an attorney-at-law for the purposes of this appeal, it is sufficient to note that, in 1891, the term attorney-at-law was not a designation limited to attorneys with courtroom experience. Thus, even if the legislature subjectively intended to require that the attorney general be a person with litigation experience, that intention was not articulated by the use of the term attorney-at-law in § 3-124.

I also disagree with the majority's conclusion that the term "practice at the bar" necessarily means courtroom experience. First, I believe that, in this regard, the majority misapplies this court's holding in *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, 145 Conn. 222, 140 A.2d 863 (1958), to the facts of this case. In that case, this court examined the unauthorized practice of law statute[3] and noted that, prior to its revision, nonattorneys were explicitly prohibited only from "plead[ing] at the bar of any court of this State . . . ." General Statutes (1887 Rev.) § 784; see *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, supra, 233–34; see also *Grievance Committee* v. *Dacey*, 154 Conn. 129, 137–38, 222 A.2d 339 (1966) (until 1927, unauthorized practice of law statute prohibited only pleading at bar

[3] General Statutes (1887 Rev.) § 784 provides: "The Superior Court may admit and cause to be sworn as attorneys, such persons as are qualified therefor, agreeably to the rules established by the judges of said court; and no other person than an attorney, so admitted, shall *plead* at the bar *of any court* of this State, except in his own cause; and said judges may establish rules relative to the admission, qualifications, practice, and removal of attorneys." (Emphasis added.)

of any court of this state, but did not forbid practice of law outside of court), appeal dismissed, 386 U.S. 683, 87 S. Ct. 1325, 18 L. Ed. 2d 404 (1967). The references in those cases to "pleading" and "at the bar of any court in this state," are readily distinguished from the statutory language of § 3-124, which addresses "practice at the bar of this state," without reference either to "pleading" or "court." These linguistic differences between the unauthorized practice of law statute and § 3-124 make it plain that if the General Assembly had wished to require expressly that a candidate for attorney general have a litigation practice, it knew how to do so by making reference either to the word pleading or by specifying that such experience had occurred at the bar "of any court."

Contrary to the majority's assertion that the phrase "at the bar" refers to the courtroom, I believe that the trial court correctly concluded that the meaning of "at the bar" depends upon the context in which it is used. This was as true in the nineteenth century as it is today. For example, in 1873, this court held, in *Phelps* v. *Hunt*, 40 Conn. 97, 101 (1873), that an attorney's standing at the bar was a relevant consideration in determining the value of services that he had rendered and for which he had brought an action. There, the phrase "at the bar" referred to an attorney's standing among his peers and had no relation to the courtroom. Id.[4] Indeed, the phrases, "at the bar," "to the bar" and "of the bar" are often used interchangeably. I agree that the phrase "at

[4] Similarly, this court, in *Stoddard* v. *Sagal*, 86 Conn. 346, 348, 85 A. 519 (1912), held that in an action brought by an attorney for legal fees, evidence of the attorney's "character and standing [at the bar] . . . the experience acquired, the degree of skill, [and] the faculty of using professional knowledge" was admissible to prove the value of his services. There, as in *Phelps* v. *Hunt*, supra, 40 Conn. 101, it is clear that this court's reference to the attorney's standing at the bar related to his reputation in the legal profession. See also *Slade* v. *Harris*, 105 Conn. 436, 444, 135 A. 570 (1927) ("one's standing at the bar") to the same effect.

the bar" refers to being in the courtroom when it is used in the context of "at the bar of the court" or "plead at the bar" or "argue at the bar."[5] Because the phrase "at the bar" also has been used in reference to an attorney's standing in the legal community, however, the term "at the bar," without specific reference to court or pleading, cannot reasonably be understood to connote courtroom practice.

Furthermore, as the trial court also pointed out, the phrase "at the bar" was, and still is, used in our rules of practice governing the admission of attorneys, without examination, from other states and without regard to the particular form or setting of their intended practice. Section 8 (a) of rule 1 of the 1908 Rules of the Superior Court provides in relevant part: "Any attorney and counselor in the highest court of original jurisdiction in another state may be admitted to examination before [the bar examining] committee, upon satisfactory proof to said committee that he is such attorney and counselor, a citizen of the United States, a resident of the state of Connecticut or intends to become such resident, twenty-one years of age, of good moral character, and that he has filed with the clerk of the Superior Court in the county where the examination is to be held a certificate from the clerk of the Superior Court . . . together with a certificate of good moral character signed by two members of the bar of this state of at least five years' standing at the bar . . . ." Subsection (b) of § 8 of the 1908 Rules of the Superior Court provides in relevant part: "[i]f any such attorney and counselor shall have practiced for three years in the highest

---

[5] See *State* v. *Gethers*, 197 Conn. 369, 389 n.19, 497 A.2d 408 (1985) ("make any plea at the bar" [internal quotation marks omitted]); *State* v. *Avcollie*, 174 Conn. 100, 104, 384 A.2d 315 (1977) ("prisoner at the bar" [internal quotation marks omitted]); *O'Brien's Petition*, 79 Conn. 46, 49, 63 A. 777 (1906) ("[p]lead at the [b]ar"), overruled on other grounds by *In re Application of Dinan*, 157 Conn. 67, 72, 244 A.2d 608 (1968); *Allen* v. *Woodruff*, 63 Conn. 369, 374, 28 A. 532 (1893) ("argued at the bar").

courts of another state he may be admitted by the court as an attorney, without examination . . . [so long as he provides] a certificate of good moral character signed by two members of the bar of this state of at least five years' standing at the bar . . . ."

Today, Practice Book § 2-16, the rule allowing out-of-state attorneys to practice in Connecticut, permits such practice, without examination, by "[a]n attorney who is in good standing at the bar of another state . . . upon special and infrequent occasion and for good cause shown upon written application presented by a member of the bar of this state . . . ." The interchangeable uses of the terms "at the bar" and "of the bar" undermine the majority's conclusion that the phrase "at the bar," without reference to the court or pleading, means courtroom practice.

I acknowledge that the majority's conclusion that the General Assembly intended for the attorney general to have litigation experience finds some support in the responsibilities ascribed to that office by General Statutes § 3-125, which was enacted as part of the same Public Act as was § 3-124. See Public Acts 1897, CXCI, §§ 2 and 3. It is a fair conclusion that the responsibilities set forth in § 3-125 relate, primarily, although not exclusively, to the representation of agencies of the state in matters in court. Although this assignment of responsibilities is some evidence that the legislature intended for the attorney general to be a person capable of handling litigation, I do not believe that the implication of § 3-125 is sufficiently clear to overcome the unrestrictive language of § 3-124, which does not require that the attorney general be an attorney with ten years of litigation experience.

In sum, I agree with the majority that the eligibility requirements set forth in § 3-124 contain some ambiguity as to whether, to be eligible, a candidate for attorney

general must have ten years of active courtroom practice. Contrary to the majority, however, I do not think a reasonable reading of the statutory language leads to the conclusion that the term "attorney at law" or the phrase "at the bar" refer to the courtroom. Rather, I believe, they refer to one's membership and active participation in the legal profession of the state. As to the assignment of responsibilities set forth in § 3-125, enacted simultaneously with § 3-124, although the recitation of responsibilities evinces a legislative interest in having an attorney general competent to handle litigation, the implication of § 3-125 is insufficient to overcome the nonrestrictive language of § 3-124. Finally, given the ambiguity in § 3-124, I am aware of no prudential reason to disregard our jurisprudence which counsels in favor of liberally construing ambiguous election eligibility statutes so as to give the electorate the broadest choice. Accordingly, I respectfully concur.